# In the
# United States Court of Appeals
## For the Seventh Circuit

Nos. 02-3501 & 03-1416

RENARD J. HARVEY, and ROBBIE CLARK, as
personal representative of RALPH KING, deceased,

*Plaintiffs-Appellees,*

*v.*

OFFICE OF BANKS AND REAL ESTATE and
William A. DARR, in his official capacity as
Commissioner of the Office of Banks and
Real Estate,

*Defendants-Appellants.*

Appeals from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 97 C 5463—**Wayne R. Andersen**, *Judge.*

ARGUED SEPTEMBER 3, 2003—DECIDED JULY 26, 2004

Before RIPPLE, ROVNER, and DIANE P. WOOD, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* Renard J. Harvey, Ralph King, Brian Robinson, and Dennis Wells, all African-Americans, were employees of the State of Illinois's Office of Banks and Real Estate (OBRE). In this suit, they claimed that they had been subject to unlawful racial discrimination

and retaliation on the job, in violation of Title VII, 42
U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981. Wells was
dismissed from the case at the close of the plaintiffs'
evidence and the jury found against Robinson. Harvey and
King prevailed at trial on most of their claims. The jury
found that OBRE had discriminated against Harvey on the
basis of race when it demoted him from a top management
position. King prevailed on three claims: the jury found that
he had been discriminated against on two separate oc-
casions when he failed to receive a promotion and that
OBRE retaliated against him after he complained about
race discrimination in the agency's promotion practices.
OBRE appeals from these findings, contending that there
is insufficient evidence to support the verdict in favor of
Harvey and King. We affirm.

# I

## A

Because the issues on appeal turn almost exclusively on
what evidence was before the jury, our review of the facts
is necessarily detailed. We present them in the light most
favorable to the jury's verdict. *Roy v. Austin*, 194 F.3d 840,
842 (7th Cir. 1999). On June 1, 1996, a merger of two Illinois
state agencies—the Office of Savings and Residential Finance
and the Office of Banks and Trusts—created OBRE, an entity
that oversees the regulation and licensure of, among other
things, state-chartered banks and trust companies, savings
banks and loan associations, mortgage bankers and brokers,
and real estate brokers and salespersons. The agency is
headquartered in Springfield and has offices in Chicago.

At the times relevant to this litigation, Jack Schaffer
served as the Commissioner of OBRE. Below Schaffer were
Assistant Commissioners who headed the agency's four
bureaus. Assistant Commissioner Jay Stevenson ran the
Bureau of Residential Finance, which has two divisions:

Mortgage Banking, where Harvey worked, and Thrift Regulation. Assistant Commissioner Scott Clarke headed the Bureau of Banks and Trusts Companies, which oversees state-chartered and commercial banks. The Bureau examines the information systems of banks through its Information Services section, where King worked until his death in September 1999. (King's executor, Robbie Clark, is pursuing this litigation on his behalf.) Assistant Commissioner Robert Thompson ran the Bureau of Administration, which houses the agency's human resources and equal employment opportunity personnel. Finally, Assistant Commissioner Chris McAuliffe headed the Bureau of Real Estate Professions, which regulates various entities and persons involved in real estate transactions.

OBRE employees are classified by the Illinois Department of Central Management Services (CMS), the state agency that administers the Personnel Code. In 1993-1994, CMS created a new two-tiered scheme for the classification of management titles within state agencies. Persons holding a position classified as a Senior Public Service Administrator (SPSA) are appointed to a renewable four- year term. These term appointments are intended for top management jobs that involve "major administrative responsibilities" and "policy making" duties. ILL. ADMIN. CODE tit. 80, § 302.800. In 1997, the top salary for SPSAs was approximately $96,000. By contrast, a Public Service Administrator (PSA) is not subject to the term appointment process; as of 1997 the top salary for a PSA was approximately $65,000. Testimony at trial supported the conclusion that the SPSA classification accords higher status, prestige, rank, and career opportunities. CMS also administers the regulations governing reclassification of job positions. The Personnel Code states that each agency head must report to CMS "any significant changes in the duties of every position within the agency." ILL. ADMIN. CODE tit. 80, § 301.20. Once CMS is notified of the change, it undertakes "a survey, audit, or such other

investigation as may be deemed necessary . . . to determine the proper allocation" of a position. *Id.*

B

With this background in mind, we turn first to Harvey's case. In 1976, Harvey began his employment with the Office of the Commissioner of Savings and Residential Finance, one of OBRE's predecessor agencies. Although he started out in a trainee position, Harvey steadily rose through the ranks. In 1989, he joined the Mortgage Banking division of the agency, which was charged with the examination, licensing, and supervision of regulated entities in the mortgage industry. Harvey's work, which he performed under the supervision of William Kaddatz, involved licensing. In 1991, Kaddatz gave Harvey a stellar evaluation and requested that he be promoted to an assistant supervisor position. The agency declined to follow Kaddatz's recommendation. The following year, the deputy commissioner and general counsel of the agency, Paula Hiza, seconded the promotion request and observed that Harvey was a "talented and reliable manager." Hiza commented favorably on Harvey's "professionalism, breadth of knowledge, and experience" and urged the agency to promote him. Once again, however, Harvey was not promoted. In June 1993, Kaddatz again gave Harvey high marks on his evaluation and repeated the request for a promotion by saying "it is my understanding that Mr. Harvey is finally going to be promoted to [ ] assistant supervisor."

In 1993, Schaffer became Commissioner of the agency, now renamed the Office of Savings and Residential Finance. He selected Dea Brennan to serve as Director of Mortgage Banking and requested that she reorganize the division. Brennan promoted Harvey in July 1993 to the position of Manager of Licensing, which was classified as an SPSA appointment. Harvey's four-year term was thus scheduled

to run from 1993 until 1997. After Brennan's initial favorable action, the relationship between Harvey and Brennan began to sour almost immediately. A few weeks after assuming his new post, Harvey sent Brennan a memo expressing concern with what he perceived to be her micro-management of his job duties. In this memo, Harvey complained that Brennan was frustrating his ability to manage his employees and that he felt "relegated to the position of a clerk." At about the same time, Harvey missed a day of work because of flooding at his house. In accordance with new personnel procedures that she had recently issued, Brennan demanded that Harvey bring documentation to her from his plumber. Harvey complained to Commissioner Schaffer, who told him to "placate" Brennan by bringing in a note. Harvey acquiesced and brought in a receipt from his plumber.

Although Brennan conceded that she had a "hands-on" management style, she seemed particularly invested in monitoring Harvey. Other Mortgage Banking employees testified that Brennan had a "personal vendetta" against Harvey and that she kept him on a "shorter leash" than anyone else. It is clear from the cantankerous e-mails presented to the jury that Brennan butted heads with Harvey over everything from work assignments to vacation time.

In 1994, Commissioner Schaffer issued a Request for Proposals (RFP) seeking external consultants to help him improve agency operations. He hired a consultant named Alan Drazek, who recommended that the Mortgage Banking division name Harvey as the Manager of Supervision. The person in this position was responsible for issuing communications to regulated entities addressing shortcomings raised during their examination or licensing processes. Prior to her promotion as Director, Brennan had served as Manager of Supervision with SPSA rank.

In a January 1995 memorandum, Commissioner Schaffer at last adopted Drazek's recommendation and announced that Harvey would become the Manager of Supervision in

the Mortgage Banking division. Harvey retained his SPSA designation when this job change occurred. Sometime in 1995, Donald Keane was appointed to fill the Manager of Licensing job that Harvey had vacated. Brennan called a meeting to introduce Keane, a Caucasian, to the licensing staff, who were all African-Americans. Two staff members present at that meeting, Karen Weaver-Harris and Jean Mukwaya, told the jury that Brennan had introduced Keane to them as their "overseer." Although Harvey was not present at this meeting, both Mukwaya and Weaver-Harris confided to him that they felt Brennan's use of this word was racially hostile, as it evoked the image of slaves on a plantation.

Unsurprisingly in light of this inauspicious start, Keane had a difficult time working with his staff and went to Harvey for advice. When Harvey told Keane about the "overseer" comment, which Keane claims he did not recall, Keane immediately went to Brennan, who in turn called her supervisor, Assistant Commissioner Jay Stevenson. Stevenson asked to speak with Harvey and Keane about the incident. According to Keane and Harvey, Stevenson told them that Brennan had an "abrasive personality" and that they should not worry too much about the incident. No further investigation was conducted. Both Harvey and Keane stated that they believed this was an inadequate response to the problem. Weaver-Harris and Mukwaya also told the jury that Brennan had made other comments to them that they believed were racially derogatory. Brennan said that she could not recall whether or not she made the comments.

After this incident, Harvey's relationship with Brennan continued to deteriorate. The tension between them was well known throughout the agency, as was Harvey's belief that his treatment at her hands was motivated by race. Sometime during 1995-1996, Harvey told Assistant Commissioner McAuliffe that Brennan was mistreating him because he

was black. McAuliffe testified that he reported to Schaffer in "general terms" that Harvey had concerns about race discrimination. McAuliffe also told Stevenson and general counsel Carl Stewart that Harvey had complained of race discrimination. Stevenson told the jury that he was aware of Harvey's perception that race was a factor in the way Brennan was treating him. Schaffer testified that he was aware of Harvey's unhappiness, but did not know whether it was based on concerns about racial discrimination. Brennan stated that on three occasions Harvey had complained to her about a glass ceiling for African-Americans at the agency. After the 1996 agency merger creating OBRE, Harvey was approached about taking a job in another division that was classified with the lower PSA designation. Harvey declined, saying that he did not believe that such a reclassification was justified and that he would view such an act as race discrimination. No investigation, formal or informal, was ever initiated by the agency to address Harvey's concerns.

About a month before Harvey's four-year term appointment was set to expire, Commissioner Schaffer met with Brennan and Stevenson to discuss a range of issues. Brennan testified that she "spontaneously" brought up Harvey's reappointment because she needed to make decisions about the division's staffing needs for the upcoming year. Schaffer said that he first had to decide whether Harvey would be retained by the agency or not, and if so, he then had to determine Harvey's appointment status. According to Brennan, Schaffer said that if Harvey was reappointed to another four-year SPSA appointment "there would be more of the same." Although Brennan testified that she was "plugging for Mr. Harvey's retention in the Mortgage Banking division" at the meeting with Schaffer, an e-mail she sent after this meeting reveals that she did not think highly of Harvey's performance. Schaffer testified that he decided to retain Harvey as the Manager of Supervision

based on Brennan's recommendation, but to reclassify him at the lower PSA designation.

After Schaffer asked Stevenson to relay the news, Harvey received a note from Stevenson summoning him to Springfield to discuss his future employment with the agency. Stevenson carried out this order in a bizarre way. When Harvey arrived in Springfield, Stevenson drove Harvey to Stevenson's church in a state vehicle. Harvey had no idea why Stevenson had brought him there, initially assuming that Stevenson needed to pick something up on their way to lunch. Instead, Stevenson asked Harvey to sit in a pew, explained to him that the church was a source of strength, told Harvey that he did not have a racist bone in his body, and said that Harvey should not view the reclassification as a "racial act." Stevenson then drove Harvey back to OBRE and informed him that he could accept the PSA reclassification voluntarily or have it take effect involuntarily. Harvey felt he had no choice at that point and accepted the demotion.

Harvey then filed this discrimination lawsuit, alleging that the reclassification of his job was unlawfully based on his race. The jury agreed and awarded him $100,000 in compensatory damages on his demotion claim. Based on the jury's findings, the district court awarded an additional $30,000 in back pay.

C

Ralph King began working for the Illinois Office of Banks and Trusts in 1986. Prior to joining the agency, King had worked as a computer programmer, senior programmer, programmer analyst, systems analyst, senior systems analyst, and systems project manager. King had worked his way up from a trainee position to a Bank Examiner I, Bank Examiner II, and finally Bank Examiner III. In 1993, King was promoted from Bank Examiner III to Field Supervisor,

a PSA management position with supervisory responsibilities over other bank examiners in the Chicago office. The same year that King became a Field Supervisor, a Caucasian named Tom Kaufmann was also promoted from Bank Examiner III to Field Supervisor. Kaufmann, who was located in the agency's Springfield office, had the same responsibilities as King for banks located in downstate Illinois. Larry Coleman, who served as the director of the section, supervised both King and Kaufmann.

Although King and Kaufmann both supervised the work of approximately 5-7 examiners, the record indicates that King's examinations involved larger and more complex financial institutions. Yet King's staff examiners were among the least experienced in the agency and were prone to higher turnover than their downstate counterparts. Further, King did not have any clerical or support staff in Chicago to assist him in reviewing examination reports. Although he was in a management position, King had to do all of his own copying, faxing, and typing. Despite these challenges, King was also appointed by the agency to head a Y2K compliance effort intended to ensure that the information systems of regulated financial institutions were adequately prepared for the new millennium.

According to Coleman's evaluations, King performed his job at the highest level. In 1994, Coleman gave King the best rating possible, commenting on the "phenomenal" job King had done training new examiners and the "superior" management skills he had exhibited during his first year in the Field Supervisor position. Coleman again gave King the highest possible rating in 1995, noting that King continued to meet the many challenges of his job in "an exemplary manner."

The division underwent a reorganization in 1995 and Coleman was laid off. Scott Clarke took over Coleman's duties. Clarke asked Kaufmann, the downstate Field Supervisor, to assume increasing responsibilities as "acting" Assistant Director. Clarke did not post this position and did not

consider King. Although Kaufmann was never formally appointed to the Assistant Director position, he received a pay raise in 1996 for doing the job. As part of his increased responsibilities, Kaufmann conducted King's performance evaluation in 1996. King explained that he and Kaufmann had risen through the ranks together and that Kaufmann had once said that King should have been named to the Assistant Director position. In his evaluation, Kaufmann awarded King the second-highest rating. When asked at trial for the basis of his rating, Kaufmann stated that King's turnaround time on examination reports was longer than the division standard. However, there is no mention of turnaround time in Kaufmann's written evaluation. According to King, Kaufmann had said that Clarke instructed him not to give King the highest rating on his evaluation. Even though Kaufmann and Clarke denied that this occurred, the jury obviously chose to believe King. Furthermore, Clarke admitted that Kaufmann came to him after conducting King's evaluation to "bounce it off of him."

In December 1996, Kaufmann announced his resignation. The agency did not post Kaufmann's position. Instead, Clarke promoted a Caucasian named John Turner to fill Kaufmann's Field Supervisor position. Turner had been a Bank Examiner III and had no management or supervisory experience with the agency. Despite King's experience in the Field Supervisor position, Clarke chose to give Turner the "acting" Assistant Director title that Kaufmann had assumed. Although Clarke told the jury that he had considered King for the Assistant Director position, employment forms produced at the time of Turner's promotion stated that Turner "was the only candidate considered."

King believed that Clarke's decision to appoint Turner was motivated by race. On May 7, 1997, King sent a memo to Clarke, stating that the manner in which Kaufmann and Turner were selected for the "acting" Assistant Director job violated the agency's equal employment policy. Specifically,

King told Clarke that he (King) should have been "afforded an opportunity to advance in this Agency just like anyone else." King continued: "To deny me this right is <u>Discrimination</u>, and accordingly, a violation of Section XVI of the Agency Employee Handbook." King added that only if all employees are "allowed to compete for job positions on an equitable basis . . . <u>can</u> we say that this Agency provides <u>Equal Employment Opportunity</u> for everyone in the Agency." He concluded the memo by informing Clarke that he wanted to discuss these concerns at their upcoming meeting regarding King's 1997 performance evaluation. King never received a response to his memorandum from anyone at the agency.

What Clarke did in response to King's memorandum is not clear because he gave inconsistent statements at trial. First, Clarke told the jury that he referred King's memo to an Equal Employment Opportunity officer at the agency and never discussed the memo with King. Clarke then testified that he met King in Chicago on May 7, 1997, to discuss King's performance evaluation. (He thought that the meeting occurred on May 7, but he could not produce any evidence to support this assertion.) He claimed that he did not discuss King's memo at the performance evaluation because he had not yet received it. When impeached with his own deposition testimony asserting that he had discussed the memo with King at his "subsequent" performance evaluation, Clarke explained that "subsequent" meant King's performance evaluation in 1998, a full year later. When pressed, he changed his story again and said that in 1998 he did not actually discuss King's May 7 memo but simply addressed King's broader concerns about his job. Clarke claims he completed King's evaluation form on the following day, May 8, but did not see King's memo until May 9, when he returned to his Springfield office.

Apart from these shifting tales, the evidence showed that Clarke signed the salary adjustment form accompanying

King's 1997 performance evaluation on May 8, one day after King sent his memo. This form indicates that King received the second-highest rating and that Clarke had recommended a salary increase in the middle of the range permissible for this rating. Although Clarke was quick to submit the salary adjustment form, he did not sign King's substantive evaluation until June 5, 1997. Unlike the glowing comments in King's previous evaluations, the 1997 evaluation observed that King "has at times appeared to be resistant to change in policies, procedures and techniques."

Turner resigned from the agency effective May 5, 1998. Instead of approaching King to take over the position, as he had done with Kaufmann and Turner, Clarke posted the Assistant Director position at the SPSA level. Shortly after seeing the announcement, King sent an e-mail to Clarke, asking that he be considered for the job. King also asked Clarke why the position was located in Springfield because he felt that this would discourage minority applicants from pursuing the opportunity. King testified that prior to Clarke's tenure, the Assistant Director job had been held by an employee in Chicago. Although King did not tell Clarke that he was unwilling to move to Springfield, he did voice concerns about making the move in light of the limited support he had received from Clarke. Kaufmann, who had left the agency in 1996, also applied for the Assistant Director position. A three-person interview panel, which included Clarke, selected Kaufmann over King.

In his discrimination suit, King alleged that Turner's promotion in 1997 as "acting" Assistant Director and Kaufmann's selection in 1998 as Assistant Director were based on the impermissible use of race. He also claimed that Clarke retaliated against him on his 1997 salary adjustment for his May 7 memorandum complaining of discrimination. The jury returned a verdict for King on all three counts, awarding him $100,000 in compensatory damages on the promotion claim dealing with Turner's appointment in

1997, $50,000 on the promotion claim involving Kaufmann's selection in 1998, and $150,000 on his 1997 salary adjustment retaliation claim. The district court also awarded King $4,170 in back pay.

At the end of the plaintiffs' case, and again at the close of all evidence, OBRE moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a). The district court denied both of these motions. Following the adverse verdict, the district court also denied OBRE's Rule 59 motion requesting a new trial based on excessive damages.

## II

We review *de novo* the district court's decision to deny OBRE's motion for judgment as a matter of law, *Appelbaum v. Milwaukee Metro. Sewerage Dist.*, 340 F.3d 573, 578 (7th Cir. 2003), and determine only whether any rational jury could have found for the plaintiffs. *Emmel v. Coca-Cola Bottling Co.*, 95 F.3d 627, 630 (7th Cir. 1996). Just as we do with summary judgment decisions, we examine all the evidence in the record to determine whether a reasonable jury could have found in favor of Harvey and King. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). This process differs from the one used for summary judgments only insofar as we now know exactly what evidence the jury considered in reaching its verdict. *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000). We are required to draw all reasonable inferences in favor of the nonmoving party, here Harvey and King, and we do not weigh the evidence or make credibility determinations. *Reeves*, 530 U.S. at 150; *Tart v. Illinois Power Co.*, 366 F.3d 461, 472 (7th Cir. 2004). Although we review the entire record, we disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves*, 530 U.S. at 151. Our job at this stage is not to determine

whether the jury believed the right people, but only to assure that it was presented with a legally sufficient basis to support the verdict. *Massey*, 226 F.3d at 924. Finally, our review of the court's denial of the new trial motion is for abuse of discretion. *Hasham v. Cal. State Bd. of Equalization*, 200 F.3d 1035, 1052-53 (7th Cir. 2000).

Most of the evidence that Harvey and King presented was circumstantial in nature, but that fact alone says nothing about the soundness of the jury's verdict. See *Desert Palace v. Costa*, 539 U.S. 90, 99-100 (2003) (reaffirming the utility of circumstantial evidence in proving intentional discrimination). Evidence that tends to show that a defendant's explanation for an employment practice is "unworthy of credence," *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981); *Reeves*, 530 U.S. at 147; *Massey*, 226 F.3d at 925, is probative of intentional discrimination and indeed "may be quite persuasive." *Reeves*, 530 U.S. at 147.

Notwithstanding these well-established standards, OBRE has devoted a majority of its brief to the argument that it is entitled to judgment as a matter of law because Harvey and King did not meet their *prima facie* burden under *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). This argument completely misses the mark. After a full trial, the only pertinent question is whether there was enough evidence to permit the jury to consider the ultimate questions of discrimination and retaliation. It is not, as OBRE argues, an occasion for the court to march back through the intermediary burden-shifting steps established by *McDonnell Douglas*. We instead look to the totality of the evidence to determine whether the plaintiffs presented sufficient evidence to support the jury's determinations that they were the victims of intentional discrimination and in King's case, retaliation. *Hall v. Gary Cmty. Sch. Corp.*, 298 F.3d 672, 675 (7th Cir. 2002) (*McDonnell Douglas* burden-shifting framework is "unnecessary when reviewing judgments as a matter of law"); *Millbrook v. IBP, Inc.*, 280 F.3d

1169, 1174 (7th Cir. 2002) (once a trial is complete, "the burden-shifting framework of *McDonnell Douglas* falls away"); *Hasham*, 200 F.3d at 1044 (post-trial the "*McDonnell Douglas* framework drops out of the analysis"); *Mathur v. Bd. of Trs. of S. Ill. Univ.*, 207 F.3d 938, 942 (7th Cir. 2000) ("In reviewing the district court's grant of judgment as a matter of law, we do not need to march through the familiar steps set forth in *McDonnell Douglas . . . .*"); *Massey*, 226 F.3d at 925 (after trial "we need not tarry on the to's and fro's" of the *McDonnell Douglas* framework).

## A. Harvey

Harvey presented evidence showing that he was performing his job in an exemplary fashion, and that OBRE nonetheless demoted him and treated a similarly situated Caucasian employee named Roger Copley more favorably. OBRE takes issue with Harvey's characterization of the change in his job classification from SPSA to PSA as an unfavorable action, because his salary and benefits remained unchanged, presumably in order to argue that the jury could not base a finding of discrimination on an action with no tangible ill effects. Nonetheless, the jury was not compelled to view the reclassification in this light. Even a lateral transfer with no loss in pay or benefits may, in certain circumstances, qualify as a materially adverse employment action. *Collins v. State of Ill.*, 830 F.2d 692, 702 & n.7 (7th Cir. 1987) (collecting cases). Further, there was ample evidence before the jury supporting the conclusion that reclassification from a SPSA to PSA could only be characterized as a demotion. An OBRE official conceded at trial that it is "unusual" for a person who holds an SPSA job to be reclassified to the lower PSA designation. In its ruling denying OBRE's motion for a new trial, the district court noted that several Caucasian OBRE employees testified

that they would be "far from indifferent about being relegated to the lower PSA classification."

In response to Harvey's charge that the demotion could be explained only by racial discrimination, OBRE offered the jury four alternative nondiscriminatory possibilities. It first argued that Harvey was reclassified based on the recommendation of Drazek, the external consultant retained by Commissioner Schaffer to improve agency operations. Second, it claimed that CMS (the state agency authorized with assuring that job classifications conform to the Personnel Code) had suggested that Harvey's position was more appropriately classified at the PSA level. Third, it asserted that Commissioner Schaffer relied on his own knowledge and experience to conclude that Harvey's job duties did not reach the level of an SPSA. Finally, it said that Harvey was demoted because his job did not contain the "major administrative" or "policy-making" responsibilities required by state regulations for SPSA positions. But at this stage, we can upset the jury's verdict only if it was compelled to accept one of those possibilities instead of the racial discrimination explanation it chose to believe.

Even if another jury might have accepted one or more of OBRE's theories, there is ample evidence in the record to support this jury's rejection of them. Harvey presented evidence that Drazek did not recommend reclassification of his job; that CMS never undertook a review of his position to determine if it was properly classified; and that Harvey was in fact performing SPSA-level responsibilities at the time he was demoted. The evidence also showed that Commissioner Schaffer decided to retain Copley (the Caucasian employee) in an SPSA position even though Copley held the same title as Harvey and performed similar job responsibilities. The jury was free to interpret this evidence as an indication that neither OBRE nor CMS thought that Harvey's job title and responsibilities warranted only a PSA classification.

The first of OBRE's four reasons for demoting Harvey is that Drazek recommended the reclassification. Before this court, OBRE asserted that Drazek was asked to "make sure [the agency] was in compliance with CMS rules and requirements." The RFP issued by Schaffer, however, makes no mention of CMS nor does it indicate that the outside consultant would have authority to change statutorily defined job classifications. Further, Drazek's response to the RFP does not list job reclassification as part of his proposed work for OBRE. The memorandum issued by Schaffer announcing Drazek's recommendations does not indicate that Harvey's job was to be reclassified from the SPSA level, and Harvey asserts that he was never told that he would be reclassified based on Drazek's recommendation.

The only indication in the Drazek report that Harvey should be demoted from SPSA to PSA is an undated, unnumbered organizational chart suspiciously appended to the text of the report. Individuals at Harvey's level in other divisions of the agency are given SPSA designations. Indeed, Harvey is the only person in the management level of the agency with a PSA classification. In an organizational chart dated July 1, 1997, however, which was prepared a full two and a half years after the Drazek report was complete and after Harvey's four-year term appointment expired, Harvey's position is labeled as an SPSA. Without making too much of the agency's organizational charts, we reemphasize the central point—Drazek's report makes no mention of job classifications of any kind, let alone a recommendation that Harvey should be demoted from SPSA to PSA. The job description that Drazek provided for Harvey's new post encompassed SPSA policy-making and administrative responsibilities. In the face of this evidence, there is no way to claim that the jury had to accept OBRE's contention that it demoted Harvey based on the Drazek report. More than that, the jury was entitled to view this baseless explanation as circumstantial evidence of inten-

tional discrimination. *Koski v. Standex Int'l. Corp.*, 307 F.3d 672, 677 (7th Cir. 2002); *Reeves*, 530 U.S. at 147 (stating that the jury can infer discrimination from the falsity of the employer's explanation).

The jury was also entitled to take into account the timing of the issuance of Drazek's report and the reclassification of Harvey's position. The report can help OBRE only if it honestly motivated the agency's decision *at the time* of Harvey's demotion. *Paluck v. Gooding Rubber Co.*, 221 F.3d 1003, 1015 (7th Cir. 2000); *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 695 (7th Cir. 2000); *Cullen v. Olin Corp.*, 195 F.3d 317, 324 (7th Cir. 1999), *cert. denied*, 529 U.S. 1020 (2000); *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 985 (7th Cir. 1999). Drazek issued a draft of his report in 1994, but Harvey's position was not reclassified until August 1997. At trial, OBRE officials stated that Harvey could have been reclassified at any time during his four-year term. Maybe so. But when the agency issued a memorandum in 1995 announcing the changes recommended by Drazek, it did not explain that Harvey's job had been reclassified and no one in the agency told Harvey that he was being demoted to a PSA based on Drazek's recommendation. The jury was entitled to draw an adverse inference from the agency's effort to claim that its decision to reclassify Harvey in 1997 was motivated by the three-year-old Drazek report.

The second reason that OBRE gave for its decision to demote Harvey was that CMS recommended reclassification. On the very last day of the four-week trial in this case, Assistant Commissioner Thompson, who heads the OBRE's Bureau of Administration, testified that he met with two CMS employees to review organizational charts in preparation for the 1996 agency merger. According to Thompson, the CMS employees looked at the organizational charts and observed that Harvey's position "came up as an exception" because Harvey did not have subordinates reporting to him. They suggested that the position was probably more

appropriate for the PSA classification. OBRE is pinning its argument on this casual observation. It is undisputed that CMS did not undertake a full review of Harvey's position prior to reclassification, as it is required to do under the regulations. See ILL. ADMIN. CODE tit. 80, § 301.20. Further, no documentation of the meeting between Thompson and the CMS employees was ever produced in this litigation, Thompson never spoke to anyone else at the agency about any such meeting, and CMS itself took no action in response to it. OBRE did not mention Thompson's discussion with CMS until the last day of trial and the agency did not identify the CMS employees as potential witnesses. The jury was entitled to view this last-minute and half-baked account as a post-hoc explanation "designed to obscure" unlawful behavior. *Emmel*, 95 F.3d at 629; *Perfetti v. First Nat. Bank of Chi.*, 950 F.2d 449, 456 (7th Cir. 1991).

Third, OBRE claims that Commissioner Schaffer decided to reclassify Harvey based on his own knowledge and experience. On direct examination, Schaffer was explicitly asked about what drove his decision to reclassify Harvey. He gave the puzzling answer that he "didn't want [Harvey] to get a pay cut." Schaffer did not, however, consider demoting Copley. Copley had joined the agency at approximately the same time as Harvey, and had the corresponding title and responsibilities for the division that regulated savings and loan entities. Stevenson explained that OBRE did not change Copley's classification from SPSA to PSA because Copley's salary was "too high"—Copley was earning $96,000, while Harvey was earning $58,248. This is hardly evidence that shows a nondiscriminatory environment, and there was ample evidence before the jury to show that the two men held precisely comparable jobs.

Finally, OBRE contends that Harvey was demoted because his job did not involve the "major administrative" or "policy-making" responsibilities required of SPSA positions. Again, the testimonial and documentary evidence belies

this justification. Prior to her promotion as Director, Brennan held the Manager of Supervision job as an SPSA term appointee. She testified that her responsibilities were "identical" to Harvey's and that she also did not have any direct reports in that position. The job description provided by Drazek specifically included SPSA responsibilities and trial testimony demonstrated that Harvey was indeed performing the management responsibilities contemplated by the position.

The Supreme Court has explained that the employer is in the best position to provide the actual reason for its decision and when it has failed to do so, "discrimination may well be the most likely alternative explanation." *Reeves*, 530 U.S. at 147. As the Court observed in *Furnco Construction Corporation v. Waters*, 438 U.S. 567 (1978), "when all legitimate reasons for rejecting an applicant have been eliminated as possible reasons for the employer's actions, it is more likely than not the employer, who we generally assume acts only with *some* reason, based his decision on an impermissible consideration such as race." *Id.* at 577. We conclude that OBRE's failure to produce evidence supporting its reasons for demoting Harvey entitled the jury to disregard these justifications as unworthy of belief.

The only hope remaining for OBRE lies in the Supreme Court's suggestion in *Reeves* that judgment as a matter of law may not be appropriate "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." 530 U.S. at 148. This is not such a case. Harvey introduced credible evidence to suggest that his supervisor made derogatory remarks about African-Americans and that she had a personal vendetta against Harvey that he believed was motivated by race. Nearly every high ranking official at the agency knew that Harvey believed he was being treated less favorably because he was African-American, yet no

investigation of any kind was ever initiated. When Harvey was finally told about the demotion, he was sitting in a church pew listening to Stevenson tell him that the demotion was not a "racial act." At no point in this conversation did Stevenson offer Harvey any legitimate reason for the agency's action. Relying on this evidence, the jury was entitled to infer that OBRE's decision was in fact motivated by racial animus. For all of these reasons, the district court correctly denied OBRE's motions for judgment as a matter of law in Harvey's case.

## B.  King

We now turn to the evidence supporting the jury's verdict in favor of King on his promotion and retaliation claims. OBRE relies on our decision in *Millbrook v. IBP, Inc.*, 280 F.3d 1169 (7th Cir. 2002), to argue that King cannot show pretext because Clarke selected the person he felt was most qualified for the job. (We ignore its use of the word "pretext" and consider this argument as one urging that the evidence was so one-sided in its favor that the question of discrimination should not have gone to the jury.) *Millbrook* held that, when an employer asserts that it chose an applicant instead of the plaintiff because the selected candidate was more qualified, "evidence of the applicants' competing qualifications does not constitute evidence of pretext unless those differences are so favorable to the plaintiff that there can be no dispute among reasonable persons of impartial judgment that the plaintiff was clearly better qualified for the position at issue." 280 F.3d at 1180 (citation and internal quotation marks omitted). OBRE's reliance on *Millbrook* is misplaced for at least two reasons.

First, the plaintiff in *Millbrook* failed to identify any evidence calling into question the veracity of the employer's reason for its decision. *Id.* at 1183. We recently emphasized that nothing in *Millbrook* forecloses a comparison of

qualifications where the employer offers conflicting explanations for its employment decision. *David v. Caterpillar, Inc.*, 324 F.3d 851, 862 (7th Cir. 2003). At trial, Clarke told the jury that he considered King for the "acting" Assistant Director position but ultimately selected Turner. The evidence in the record, however, contradicted Clarke's testimony by showing that Turner was the "only candidate considered." Clarke claimed that Turner was more qualified for the job because he had a Certified Information Systems Auditor (CISA) credential, which King did not. Clarke conceded, however, that the CISA was not required for the job. Finally, Clarke testified that he promoted Turner over King because Turner had better computer skills. Yet, Clarke admitted that King had the computer skills necessary to assess the information technology systems of Chicago's most sophisticated financial institutions and to head the agency's Y2K efforts.

Because Clarke's testimony was impeached and because his explanations were not supported by other evidence in the record, the jury could reasonably have come to the conclusion that Clarke did not honestly believe Turner to be the most qualified candidate. *David*, 324 F.3d at 862; see also *Emmel*, 95 F.3d at 633-34 ("The defendants are off base in arguing that because the testimony of their officers . . . was not contradicted directly, the jury had to accept it. The jury may have thought them liars. It is the prerogative of a jury or other trier of fact to disbelieve uncontradicted testimony unless other evidence shows that the testimony must be true.") (quoting *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 746 (7th Cir. 1994)). When a plaintiff offers specific evidence from which the jury may reasonably infer that the proffered reasons are not truthful, the case turns on the credibility of the witnesses. *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir. 1995). In reviewing a Rule 50 motion, we will not second-guess a jury on credibility issues. It was the jury's prerogative to disbelieve Clark's testimony and we have no basis to question its decision.

OBRE's reliance on *Millbrook* is troubling for a second reason. Turner had not only been promoted over King. Turner had leapfrogged over King by moving from a Bank Examiner III to the acting Assistant Director position. King had served as a Field Supervisor since 1993 while Turner worked in a non-management position as a bank examiner. This is quite different from the *Millbrook* scenario. Here, with people of such disparate qualifications, a comparison of the two standing alone would be sufficient to support the jury's verdict. While there certainly may be reasons for an employer to catapult a lower-level Caucasian employee over a higher-ranked African-American employee, this type of promotion would call for a more searching inquiry into the comparable qualifications of the candidates than the one required in the *Millbrook* situation. We need not undertake this inquiry here, however, given the wealth of evidence King presented that permitted the jury to disbelieve OBRE's explanations for Turner's promotion.

With respect to Kaufmann's selection as the Assistant Director in 1998, King again presented sufficient evidence for the jury to infer discrimination. At trial, Clarke testified that King was qualified for the Assistant Director position. On appeal, OBRE argues that King was not promoted because he wavered about relocating to Springfield. But nowhere in the record is there evidence that King flatly refused to make such a move. Furthermore, King's hesitation to relocate cannot be viewed in isolation. Recall King's testimony that the Assistant Director prior to Clarke's tenure was based in Chicago. The jury might have thought that the agency would be flexible about the official duty station of a Caucasian, but not of an African-American. In addition, King had told Clarke that he believed that the agency was discouraging minority applicants by basing the job in Springfield. King expressed concerns about moving to Springfield because of the lack of support he had received from Clarke in the past. Under all the circumstances, the

jury was entitled to conclude that geography had nothing to do with OBRE's choice of Kaufmann over King, and that the reason was once again racial discrimination.

Finally, the jury found that King had been retaliated against on his 1997 performance evaluation. The protected conduct that forms the basis of this claim is the memorandum King sent to Clarke on May 7 alleging that the agency's promotion practices were discriminatory. The following day, Clarke gave King a lower salary adjustment, which contrasted dramatically with King's earlier record of receiving the highest amounts possible.

At trial, Clarke's testimony on this claim raised substantial credibility questions. As our earlier discussion illustrates, his explanation of what happened in response to King's memorandum is riddled with contradictory or unsupported statements. He changed his story at least three times and was impeached with prior inconsistent statements. His "failure to express consistent explanations at trial or deposition could compel a jury to find that his proffered reasons . . . were pretextual for something much more invidious." *Hasham*, 200 F.3d at 1047.

Once again, we find that there was substantial evidence supporting the jury's determination on King's retaliation claim. As we explained in another case dealing with a Rule 50 motion: "The relevant facts were fully aired before the jury, and it fell to the jury to sort out which side's version was more likely true. . . . The jury in this case resolved the credibility questions and competing inferences posed by the trial evidence in [the plaintiff's] favor, and we have no reason to disturb its assessment of the facts." *Appelbaum*, 340 F.3d at 581. The district court's denial of OBRE's motion for judgment as a matter of law on King's three claims was also correct.

## III

OBRE also argues that even if it is not entitled to judgment as a matter of law, the district court nonetheless should have ordered a new trial on damages, because the jury's verdicts were excessive. We review the district court's refusal to grant a new trial on the grounds of excessive damages for an abuse of discretion. *Tullis v. Townley Eng'g & Mfg. Co., Inc.*, 243 F.3d 1058, 1066 (7th Cir. 2001). We have typically looked at three factors when we review compensatory damages awards: (1) whether the award is monstrously excessive; (2) whether there is no rational connection between the award and the evidence; and (3) whether the award is roughly comparable to awards made in similar cases. *Lampley v. Onyx Acceptance Corp.*, 340 F.3d 478, 483-84 (7th Cir. 2003) (citing *EEOC v. AIC Sec. Investigations, Ltd.*, 55 F.3d 1276, 1285 (7th Cir. 1995)). In *AIC Security*, we acknowledged that the "monstrously excessive" inquiry is a vague one that may simply be another way of asking whether there is a rational connection between the award and the evidence. *Id.* at 1285 n.13.

In this case, the jury heard detailed and specific testimony from several witnesses about how OBRE's conduct affected Harvey and King. Harvey testified to stomach problems and other physical ailments that he claims arose from his discriminatory treatment at work. The jury heard that Harvey suffered from depression and sought counseling. Harvey's co-workers told the jury how frustrated and upset Harvey became on numerous occasions as a result of the agency's actions. The record contains many examples of the humiliation that Harvey suffered at the hands of his superiors. Brennan required Harvey to keep his door open at work, even though he occupied a high level management position. When Harvey came into the office over the weekend on one occasion, Brennan asked Assistant Commissioner McAuliffe to review the entry log and security cameras because she was worried that Harvey had been in her office.

McAuliffe determined that Harvey had followed proper procedures for entering the building after hours and conceded that Brennan's request was "out of bounds of normal business conduct." Copley was "shocked" to learn that Harvey made nearly $30,000 less than he did because Harvey had been at the agency longer and had done essentially the same jobs. Copley told the jury that he and Harvey both were given the toughest assignments in the agency and that he learned a great deal from working with Harvey over the years.

King likewise testified to a series of continuing mental and physical ailments arising from his problems at work, including depression. He began taking medication for high blood pressure in 1995, the same time Clarke became his supervisor. King's brother testified that King began to behave unusually because of the stress he was experiencing at work. He suffered some memory loss and kept more to himself than he had in the past. King's family began to bring him meals. Further, King constantly complained to his family of his frustration at being passed over for promotions that he believed he deserved. In his testimony, King recounted how the discriminatory actions by OBRE had severely affected his motivation: "I spend a lot of hours, I work a lot of overtime, although I don't get paid for it. And this makes you wonder, is it worth it after going through these same circumstances." Based on the evidence, the jury could have reasonably concluded that awards in the range of $50,000 to $150,000 were necessary to compensate Harvey and King.

We note that these damages awards are not out of line with other Title VII cases in this circuit. See *Tullis*, 243 F.3d at 1067-68 (upholding $80,000 in damages for emotional distress where plaintiff felt "degraded" and "backstabbed" by the employer). As we observed in *Lampley*, "[a]wards in other cases provide a reference point that assists the court in assessing reasonableness; they do not

establish a range beyond which awards are necessarily excessive. Due to the highly fact-specific nature of Title VII cases, such comparisons are rarely dispositive." 340 F.3d at 485.

Finally, the district court awarded Harvey $30,000 in backpay, stating that this amount "is a modest estimate of the salary loss that Mr. Harvey suffered because of the discrimination that the jury found directed against him." The district court kept the amount this low because it was reluctant to take an action that would effectively reclassify Harvey as an SPSA or lift the salary cap on his PSA position. The record reveals that the district court carefully considered OBRE's objections to the damages awards and decided to reject them in light of the overwhelming evidence presented at trial. We find no abuse of discretion in the court's rulings. "It is within the jury's province to evaluate the credibility of witnesses who testify to emotional distress, and we shall not disturb those credibility determinations on appeal." *Bruso v. United Airlines, Inc.*, 239 F.3d 848, 857 (7th Cir. 2001). The jury was able to observe testimony regarding the harm Harvey and King endured and found this testimony to be sufficient to convince them that the plaintiffs merited the awards.

## IV

For these reasons, we AFFIRM the judgment of the district court.

A true Copy:

      Teste:

_____
*Clerk of the United States Court of
Appeals for the Seventh Circuit*