In the

# United States Court of Appeals
## For the Seventh Circuit

No. 05-1946

LONNIE DAVIS, JR.,

*Plaintiff-Appellee,*

*v.*

WISCONSIN DEPARTMENT OF CORRECTIONS,
THOMAS E. KARLEN, and KATHRYN LONG,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 04 C 258—**John C. Shabaz**, *Judge.*

ARGUED SEPTEMBER 22, 2005—DECIDED APRIL 27, 2006

Before EASTERBROOK, EVANS, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* Lonnie Davis, Jr. is an African-American who has worked for the Wisconsin Department of Corrections ("DOC") at its Jackson Correctional Institution ("JCI") in Black River Falls since 1997. He began his employment as a correctional officer and was promoted to the rank of sergeant in 1999. Following allegations that he harassed a female coworker in 2001, the DOC—acting through defendants Thomas Karlen (JCI's warden) and Kathryn Long (JCI's human resources director)—demoted Davis to the rank of "Correctional Officer B." Davis sued the DOC, Karlen, and Long (among

others dismissed before trial) under Title VII of the Civil Rights Act of 1964 (42 U.S.C. §§ 2000e *et seq.*), 42 U.S.C. § 1981, and 42 U.S.C. § 1983, alleging they demoted him because of his race, and that the DOC unlawfully tolerated a racially hostile work environment. The district court disposed of Davis's hostile work environment claim and dismissed several defendants at the summary judgment stage, and Davis proceeded to a jury trial on his Title VII claim against the DOC and his § 1983 claim against Karlen and Long. The jury returned a verdict for Davis against all three defendants, and the defendants then moved unsuccessfully for judgment as a matter of law under FED. R. CIV. P. 50 or, in the alternative, for a new trial under FED. R. CIV. P. 59. On appeal, the defendants challenge the district court's denial of their Rule 50 and 59 motions. We affirm.

## I.  Background

This appeal challenges the sufficiency of the evidence to support the verdict in Davis's favor, so a detailed recounting of that evidence is warranted, and we view it in the light most favorable to the jury's verdict. *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 701 (7th Cir. 2004). During Davis's first four years of employment at JCI, he consistently received satisfactory performance evaluations, and there is no evidence he committed any work rule violations during that period. Robin Boyd was a white, female social worker who worked at JCI in the same building as Davis—the "X Building." On August 24, 2001, Boyd complained to her supervisor, Unit Manager Steve Dougherty, that on August 22 Davis told her he wanted to yell at her before she left her shift and instructed her to sit down in a chair in the X Building's officers' station. Boyd told Dougherty that Davis then sat down in a chair facing her, grabbed both arms of her chair, pulled her toward him until their knees were touching, and refused to let her get

up. Boyd could not remember how long Davis held her chair, and the record does not indicate whether she ever gave an account of what Davis said to her. She did say that while Davis detained her in the chair, he said to Correctional Officer Stephanie Buck, who was passing by, "You better get up in front of that fan, girl, before you pass out because I'd hate to do mouth-to-mouth on you in front of the inmates."

Boyd also accused Davis of the following: being overprotective of her and other female coworkers; asking her if she would ever have an affair; undermining her authority by correcting her in front of inmates; telling her that if she smiled at him, she was flirting, and that if she moved around too much, she was teasing the inmates; telling her he could tell when a woman was menstruating; and telling her about his reverse vasectomy. Boyd did not testify at trial, but portions of her deposition containing these allegations were read into the record at trial.

Human Resources Director Long and Susan Waters, an equal opportunity specialist from the DOC's Office of Diversity and Employee Services, investigated the August 22 incident and Boyd's other allegations against Davis. Warden Karlen testified that he brought in Waters from the Office of Diversity because he "wanted a fair look at everything" and because Davis was African-American.

At the time of the August 22 incident between Davis and Boyd, Correctional Officers Sharon Nawrocki and Stephanie Buck were also present in the officers' station. Buck testified at trial that she was working in the X Building that day moving inmates to other units. This required her to walk repeatedly from one end of the officers' station to the other—apparently a fairly narrow space—and other workers, including Boyd, were in her way. She observed the conversation between Davis and Boyd and said that it was "[n]o louder than you'd have to speak in that environment."

She says she never saw Davis restrain Boyd. Although she did see Davis touch Boyd's chair, Buck said he did so only to clear a path for her (Buck) as she did her work. According to Buck, the "mouth-to-mouth" comment was not sexual in nature, and she "never thought twice about it. It was hot out and I was running like crazy," she explained. She said she had gone up to the "tower" where there was no ventilation and it was about 100 degrees; by the time she got back down to the officers' station, she was sweating. "And [Davis] had, for my own health reasons was concerned and said, 'You need to slow down,' and something to that effect, 'you know, I wouldn't want you to pass out, you know,'" Buck testified.

Buck's trial testimony was at odds with what the DOC said she told Long and Waters when they interviewed her on August 31, 2001. According to the DOC's notes from that interview, Buck said she was frustrated by the "mouth-to-mouth" comment and that it made her job more difficult. The DOC's notes also indicated Buck said that on August 22 she observed Davis speaking loudly to Boyd while facing her and keeping his hands on the two arms of Boyd's chair. "I felt sorry for her. She was there—it must have been an hour sitting there—and the conversation seemed so intense, just knowing him from here—if something is bothering him, he won't let it go," Buck reportedly told the investigators. When asked about these discrepancies at trial, Buck testified that the DOC's interview notes inaccurately recorded the statements she gave to Long and Waters. She stood by her trial testimony.

Long and Waters interviewed Nawrocki on August 30. Nawrocki was present in the X Building officers' station at the time of the August 22 conversation between Davis and Boyd, but she said she tries to mind her own business and had not noticed any long, loud conversation. According to Nawrocki, Boyd apologized to her that day about "the conversation," and Nawrocki said she did not know what

Boyd was talking about. When asked about Boyd's al-
legations that Davis engaged in various forms of inappropri-
ate conduct, Nawrocki said she had never seen Davis
behave that way. Nawrocki's trial testimony was substan-
tially consistent with the DOC's notes from her investiga-
tory interview in August 2001. The only real difference was
that at trial Nawrocki said she told Long and Waters during
her interview that she *did* hear a loud conversation on
August 22, but she maintained that it was not a conversa-
tion between Davis and Boyd.

Long and Waters also interviewed several other JCI
employees who corroborated most of Boyd's allegations
against Davis. Although none of these "corroborators"
testified at trial, Long testified that she credited their
version of the facts and discounted Buck and Nawrocki's
defense of Davis when she recommended his demotion.

After discussing her investigation with Warden Karlen,
Long drafted a five-page memorandum recommending
that Davis be demoted for harassing Boyd. Relying on
the interviews with JCI employees who corroborated most
of Boyd's complaints, the memo concluded that Davis
violated DOC Work Rule 13, which prohibits "intimidating,
interfering with, harassing, (including sexual or racial
harassment), demeaning, or using abusive language in
dealing with others." The memo cited Davis's "mouth-to-
mouth" comment to Buck as an example of the need for
discipline, even though Long testified that she did not think
the comment constituted sexual harassment, and stated at
her deposition that "at the time [she didn't] know that it
came across in any way that seemed inappropriate." Most
importantly (for reasons that will become clear), the memo
stated that Davis's breach of Work Rule 13 was a category
B violation. Karlen testified that he personally reviewed the
memo before approving it.

The DOC had a progressive discipline policy in place in
2001. According to that policy—introduced into evidence

at trial—the first instance of a category B violation of Work Rule 13 should be punished by a written reprimand, a second violation by a one-day suspension without pay, and a third violation by a three-day suspension without pay. Violations of Work Rule 13 that fell into the more serious category C could be punished by "severe discipline up to and including discharge for the first offense." The memo drafted by Long and approved by Karlen recommended that Davis be demoted for his first category B violation of Work Rule 13, so on its face it was not in keeping with the DOC's policy of progressive discipline. If Long and Karlen had applied the policy as written, Davis would have received only a written reprimand.

The record contains evidence that two white JCI sergeants, Richard Laxton and Richard Malchow, committed category B violations of Work Rule 13 and received lesser discipline than Davis. Malchow violated Work Rule 7 in addition to Work Rule 13. Laxton's violation was his third category B violation within a twelve-month period, so in accordance with the DOC's progressive discipline policy, he received a three-day unpaid suspension. The conduct underlying Laxton's category B violation included the following: treating a fellow officer unprofessionally and requiring that officer to perform additional responsibilities beyond what he demanded from other officers, using the "all-call" system to contact that same officer rather than more discretely using the radio, and criticizing the officer's performance in front of inmates. In Malchow's case, the category B violation was based on his defacing of staff identification photographs with derogatory comments. Because it was Malchow's first violation, he received a written reprimand as called for by the progressive discipline policy.

Long testified at trial that she thought Davis had committed a category C violation and that she must have made a typographical error when drafting the disciplinary memo.

She said she usually generated disciplinary memos by using an older document as a template. According to Long, she probably just failed to change the disciplinary category that was left over from the previous document that served as the template for Davis's memo. Long and Karlen both testified they believed Davis's conduct was serious and constituted a category C violation. But Long also admitted at trial that during her deposition she agreed that she "may have" initially recommended that Davis's violation fell into category B. She also told the jury that at the time she recommended Davis's demotion, she was unaware of any white JCI employees who were demoted for first-time category B rule violations. Warden Karlen testified that Davis was the first person at JCI he had demoted for a first-time violation of Work Rule 13. The DOC produced no documentary evidence showing Davis's conduct was ever referred to as a category C violation, and the DOC never corrected the memo itself.

The jury found the DOC, Karlen, and Long demoted Davis or recommended his demotion because of his race and rendered a verdict holding the DOC liable under Title VII and Karlen and Long liable under 42 U.S.C. § 1983. The district court denied the defendants' subsequent Rule 50 and 59 motions.

## II. Discussion

### A. Rule 50 Motion

We review the district court's denial of a motion for judgment as a matter of law de novo and look to the record as a whole to decide "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, was sufficient to support the jury's verdict of race discrimination." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1173 (7th Cir. 2002) (citing *Collins v. Kibort*, 143 F.3d 331, 335 (7th Cir. 1998)). "Although we review the entire record,

we disregard all evidence favorable to the moving part[ies] that the jury is not required to believe."[1] *Harvey*, 377 F.3d at 707 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). "'We will overturn a jury verdict for the plaintiff only if we conclude that no rational jury could have found for the plaintiff,'" *id.* (quoting *Collins*, 143 F.3d at 335), but "'a mere scintilla of supporting evidence will not suffice.'" *Millbrook*, 280 F.3d at 1173 (quoting *Futrell v. J.I. Case*, 38 F.3d 342, 346 (7th Cir. 1994)).

At the posttrial stage we do not view employment discrimination claims through the prism of the prima facie case/burden-shifting paradigm set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Harvey*, 377 F.3d at 708. When reviewing the district court's disposition of Rule 50 and 59 motions, this Court's only concern is whether there was sufficient evidence to permit the jury to consider the ultimate question of racial discrimination, that is, whether the evidence was sufficient to pave a rational path to the jury's finding of intentional discrimination. *See id.* The same standards for proving intentional racial discrimination apply to Title VII and § 1983 equal protection claims. *Hildebrandt v. Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1036 (7th Cir. 2003). On either claim the plaintiff must prove that he suffered discrimination because of his race.

The defendants argue that Davis presented neither direct nor circumstantial evidence that he was demoted because of his race. They emphasize that there was no direct

---

[1] "That is, the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (internal quotation and citation omitted).

evidence that the DOC, Karlen, and Long were motivated by racial animus. True enough, but the absence of direct evidence does not necessarily undermine this verdict. The defendants also attempt to minimize the importance of Davis's circumstantial evidence, but their argument misapprehends the legitimacy and adequacy of circumstantial evidence in this context.

It is well settled that a plaintiff may prove intentional discrimination by either direct or circumstantial evidence, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003), and the Supreme Court has "often acknowledged the utility of circumstantial evidence in discrimination cases." *Id.* at 99-100. "The reason for treating circumstantial and direct evidence alike is both clear and deep rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" *Id.* at 100 (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 508 n.17 (1957)). In the context of employment discrimination cases, the Supreme Court has specifically "recognized that evidence that a defendant's explanation for an employment practice is 'unworthy of credence' is 'one form of *circumstantial evidence* that is probative of intentional discrimination.'" *Id.* at 99-100 (quoting *Reeves*, 530 U.S. at 147) (emphasis added by *Desert Palace*). In other words, "a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated*." Reeves*, 530 U.S. at 148.

We apply *Reeves* by first considering whether the evidence was sufficient to demonstrate that the defendants' asserted justification for demoting Davis was pretextual and then reviewing the entire record to determine whether the evidence presented could reasonably support a finding of racial discrimination. *Millbrook*, 280 F.3d at 1175. Davis's evidence of pretext centered on the DOC memo—drafted by

Long and approved by Karlen—that identified his infraction as a category B violation of Work Rule 13 and recommended his demotion. Davis compared that memo with the DOC's progressive discipline policy to show that his demotion far exceeded the punishment prescribed by the DOC's own guidelines, which called for first-time category B violators to receive only a written reprimand. Accepting the memo's assertions at face value that this was Davis's first rule violation and that it fell within category B,[2] the DOC punished Davis more harshly than its disciplinary policy permitted.

This is the kind of evidence from which the jury reasonably could have determined that the defendants demoted Davis for a reason other than his category B violation of Work Rule 13. A plaintiff may demonstrate his employer's reason is pretextual, i.e., that it is "deceit used to cover one's tracks," by showing the reason "(1) had no basis in fact; (2) did not actually motivate [the adverse employment action]; or (3) was insufficient to motivate the [adverse employment action]." *Davis v. Con-Way Transp. Cent. Express, Inc.*, 368 F.3d 776, 784 (7th Cir. 2004) (quotations and citations omitted). The discrepancy between the punishment prescribed by the DOC's disciplinary policy and the far more severe sanction the defendants imposed on Davis could have led the jury rationally to conclude that Davis's category B violation was insufficient to motivate his demotion and was therefore pretextual.

Because the evidence was sufficient to show pretext, we next examine the totality of the evidence presented at

---

[2] The parties dispute whether this was a category B or C violation, but as we explain below, the jury was entitled to resolve this issue in Davis's favor. So, viewing the evidence in the light most favorable to Davis, we assume the jury chose to believe he committed only a category B violation. The DOC's memo was, after all, the only written documentation of the severity of Davis's infraction, and it stated Davis committed a category B violation.

trial to see whether it supports the jury's finding of intentional racial discrimination. *Millbrook*, 280 F.3d at 1175. We engage in this review because Davis's burden was not merely to convince the jurors that the defendants' explanation for his demotion was false, he needed also to persuade them that he was actually demoted because of his race. *See Reeves*, 530 U.S. at 147-48; *Millbrook*, 280 F.3d at 1174. Despite a plaintiff's showing of pretext,

> an employer would be entitled to judgment as a matter of law if the record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred.

*Reeves*, 530 U.S. at 148.

This is not a case where the record "conclusively" points away from racial discrimination; nor is there "abundant and uncontroverted independent evidence" that no discrimination occurred. The defendants' evidence consisted of their own testimony that they took Davis's conduct seriously, that they thought it was a category C violation, and that the DOC memo contained a typographical error (apparently undetected by Long, Karlen, and the other DOC officials who reviewed it). Of the four witnesses defendants presented at trial, two were defendants Long and Karlen, a third was Steve Dougherty (Boyd's supervisor who assisted Long in investigating Boyd's complaints against Davis), and the fourth was Waters (the equal opportunity program specialist brought in from the DOC's central office who worked with Long throughout the investigation). With the possible exception of Waters, these were not witnesses who could supply the necessary "independent evidence that no discrimination had occurred." *See Reeves*, 530 U.S. at 148.

Because the DOC memo placed Davis's offense in category B, the defendants needed to persuade the jury with credible evidence that things were not as the memo said they were. They needed to convince the jury that the official DOC record identifying the severity of Davis's infraction—a record that they themselves produced and approved—was in fact erroneous. The jury obviously found their evidence less than credible on this point, and we have repeatedly stated that we will not reweigh the evidence or second-guess the jury's credibility determinations. *Harvey*, 377 F.3d at 707 (citing *Reeves*, 530 U.S. at 150; *Tart v. Ill. Power Co.*, 366 F.3d 461, 472 (7th Cir. 2004)). In fact, the testimony of Long, Karlen, Dougherty, and Waters is the type of evidence we generally disregard when reviewing denials of posttrial relief because it is neither uncontradicted (the DOC memo contradicts it) nor does it come from disinterested witnesses. *Harvey*, 377 F.3d at 707 (citing *Reeves*, 530 U.S. at 151) (court should "give credence" to evidence supporting a Rule 50 movant only when such evidence "is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses") (quotation and citation omitted).

Davis supplemented his evidence of pretext with evidence that two similarly situated white sergeants, Laxton and Malchow, received lighter punishments for category B violations of Work Rule 13 consistent with the DOC's progressive discipline policy. Proving intentional discrimination with this type of circumstantial evidence is common practice. *See Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720-21 (7th Cir. 2005). Laxton and Malchow were white sergeants at JCI, they both committed category B violations of Work Rule 13, and Long and Karlen decided to punish them according to the DOC's progressive discipline guidelines—a three-day unpaid suspension for third-time offender Laxton and a written reprimand for Malchow's first violation. Unlike these white sergeants, Davis was demoted for a category B violation of Work Rule 13.

The defendants try to combat the inference of discrimination by arguing that Davis's conduct was significantly worse than either Laxton's or Malchow's—bad enough, in fact, that he actually committed a category C violation of Work Rule 13, notwithstanding the DOC memo. But as we have already noted, this was a determination properly reserved for the jury because it turned largely on the credibility of the defendants' own testimony. There was sufficient evidence for the jury to disbelieve the defendants' "typographical error" explanation. Despite their insistence that the memo was incorrect, the defendants never bothered to correct it; they were unable to produce any documents stating that Davis actually committed a level C infraction; and Long was impeached at trial with her deposition testimony admitting that she might have initially recommended Davis's violation fell within category B.

The defendants also try to downplay the importance of the difference between a category B and category C violation. They cite *Johnson v. Artim Transp. Sys., Inc.*, 826 F.2d 538 (7th Cir. 1987), for the proposition that courts should compare conduct, not rule violations. *Id.* at 544. In *Johnson* we indeed stated that "company discipline rules are not conclusive indicators of comparable seriousness." *Id.* at 543 (citing *Green v. Armstrong Rubber Co.*, 612 F.2d 967 (5th Cir. 1980)). But just because identical rule violations do not *conclusively* indicate that offenses are of comparable seriousness, that does not mean they provide no indication at all. In *Johnson* we simply held that in a bench trial the district court "was entitled to compare conduct rather than rule violations in its disparate treatment analysis." *Id.* at 544. We explained that "[c]omparisons of identical rules violations may at times be helpful in showing a prima facie case of racial discrimination, . . . but in this case, particularly where plaintiff urges us to compare violations of similar rather than identical rules, it may well be more helpful to focus on the nature of the misconduct." *Id.* (citations omitted).

Unlike in *Johnson*, we deal here with three employees'
violations of the very same work rule. More importantly,
the DOC evaluated the severity of each man's violation and
placed all three violations in category B, or so the jury was
entitled to conclude. It is quite remarkable then that the
defendants ask us to hold that the three men's violations
were so dissimilar that no rational jury could have found
the employees to be similarly situated. Davis's alleged
misconduct was arguably more serious and extensive than
that of Laxton or Malchow, but in light of the DOC's own
assessment that all three violations were of intermediate
(category B) severity, the district court committed no error
in refusing to set aside the jury verdict and enter judgment
as a matter of law.[3]

We note only briefly that Davis also highlights the
following evidence in defense of the verdict: Buck's and
Nawrocki's eyewitness testimony denying that he re-
strained Boyd in the officers' station; Long's admission that
she did not think Davis's "mouth-to-mouth" comment
amounted to sexual harassment, but included it in her
memo nonetheless; the discrepancies between Buck's trial
testimony and the DOC's record of her statements dur-
ing the investigation; and Karlen's admission that he asked
Waters to help with the investigation partly because Davis
was African-American. According to Davis, these bits of
evidence show that the defendants manipulated their
investigation, fabricated statements against him, and that
they did so because of his race. Without more, this evidence
is too weak to support the jury's verdict. But there was

---

[3] So long as the jury found Long and Karlen actually believed
Davis committed a category B violation, it could also have
reasonably inferred racial discrimination from the fact that
Davis's punishment far exceeded the written reprimand called for
by DOC guidelines—guidelines the defendants followed precisely
when punishing Laxton and Malchow.

more to Davis's case, as we have noted, so we need not rely on this additional evidence to affirm the district court's denial of the Rule 50 motion.

## B. Rule 59 Motion

We review the district court's ruling on a Rule 59 motion for a new trial for abuse of discretion. *Latino v. Kaizer*, 58 F.3d 310, 314 (7th Cir. 1995). A new trial should be granted "only when the record shows that the jury's verdict resulted in a miscarriage of justice or where the verdict, on the record, cries out to be overturned or shocks our conscience." *Id.* (citing *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1353 (3d Cir. 1991)). As we have already discussed at some length, Davis sufficiently called into question the defendants' stated reason for his demotion and produced evidence from which the jury could reasonably conclude that the defendants treated similarly situated white employees more leniently than Davis. This is not a verdict that "cries out to be overturned," and we cannot say the district court abused its discretion when it denied the defendants' Rule 59 motion.

For the foregoing reasons, the judgment of the district court is AFFIRMED.

A true Copy:

       Teste:

                  _____
                  *Clerk of the United States Court of*
                     *Appeals for the Seventh Circuit*