# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 04-1416

LESTER BYRD,

*Plaintiff-Appellee*,

v.

ILLINOIS DEPARTMENT OF
PUBLIC HEALTH and ERIK WHITAKER,
successor in office to JOHN LUMPKIN,
Director, State of Illinois Department of Public
Health, in his official capacity,

*Defendants-Appellants*.

———————

Appeal from the United States District Court
for the Southern District of Illinois.
No. 00 C 705—**Michael J. Reagan,** *Judge*.

———————

ARGUED JANUARY 13, 2005—DECIDED SEPTEMBER 8, 2005

———————

Before ROVNER, EVANS and SYKES, *Circuit Judges*.

ROVNER, *Circuit Judge*. Lester Byrd sued his employer for race discrimination and retaliation under Title VII. A jury found against Byrd on his discrimination claim and in favor of Byrd on the retaliation claim. Byrd's employer, the Illinois Department of Public Health ("Department"), appeals, asking this court not only to vacate the judgment in favor of Byrd but also to enter judgment in its favor on the retaliation claim. We vacate and remand for a new trial.

## I.

Byrd, an African-American man, began working for the Department in 1985 as a Public Health Specialist Trainee. Over the years, he worked his way up to his current position of Public Health Specialist III. In that capacity, Byrd serves as a Regional Epidemiologist in the Department's Communicable Disease Section. His duties include investigating and preventing outbreaks of communicable diseases in his region, training others in infectious diseases, and ensuring compliance with the Department's rules and regulations by local health authorities, hospitals and doctors. The Department's main office is in Springfield and there are various regional offices throughout the State. Byrd works at the Edwardsville Regional Office. The State has three other Regional Epidemiologists, one each in the Marion, Rockford and Chicago Regional Offices. The other three Regional Epidemiologists are Caucasian. Byrd reports to Kate Kelly, Assistant Section Chief of the Communicable Diseases Section. Kelly in turn reports to Carl Langkop, the Section Chief for the Communicable Disease Section. Both Kelly and Langkop work in the Springfield office. John Pitzer, the Regional Health Officer, runs the Edwardsville Regional Office where Byrd works, but Pitzer does not supervise Byrd.

Pitzer's duties include overseeing maintenance of the building and hiring and supervising the clerical staff. In his capacity as supervisor of clerical staff, Pitzer was responsible for hiring and assigning a secretary to Byrd. Cynthia Steelman was an administrative assistant in the Edwardsville office for approximately thirteen years, working the majority of that time for Pitzer. According to Steelman's testimony at trial, Pitzer harbored a deep prej-

udice against African-American people.[1] On numerous occasions, Pitzer commented in a negative way about African-American people in general and about Byrd in particular. For example, Pitzer commented that "black people are always expecting handouts." Pitzer objected to federal and state money going to East St. Louis, Illinois, because of the large African-American population in that city and suggested that the city was a "bottomless pit" that should be bombed. Pitzer was angry when the State of Illinois reimbursed Byrd's tuition when he obtained a master's degree in public health, calling this another example of "the mindset of East St. Louis blacks" seeking handouts. Pitzer objected to a new bridge that he thought would facilitate an influx of East St. Louis African-Americans into Alton, Illinois, where he lived at the time. He commented that his wife was uncomfortable working in her yard because of African-Americans in the area. Pitzer subsequently moved to a new subdivision in Edwardsville, Illinois, only to discover that the new house next door to him had been sold to an African-American. Steelman described Pitzer as "livid" over this turn of events. Steelman also testified that Pitzer performed little skits in the office where he would speak and walk in a way that he believed mimicked African-Americans, and that he engaged in this behavior one day after editing a memo Byrd had written and posted in a common area. Pitzer apparently believed the memo misused certain verbs and contained grammatical errors. Another staff member removed the "corrected" memo before other staff arrived for the day and provided it to Steelman, who complained to Pitzer that his edits were

---

[1]  Because the Department seeks judgment as a matter of law, we construe the facts in favor of the party opposing judgment. *See Tart v. Illinois Power Co.*, 366 F.3d 461, 472 (7th Cir. 2004). We have the benefit of the trial transcript and admitted exhibits as well.

offensive and inappropriate. Pitzer replied that Steelman was "too sensitive." According to Steelman, Pitzer engaged in this kind of speech and behavior on other occasions and these incidents were merely some of the examples that stood out in her mind from the years she worked with Pitzer.

Needless to say, Byrd and Pitzer did not get along. Byrd testified that, shortly after a meeting with Pitzer one day in 1995, he was returning to Pitzer's office to ask a question he had forgotten to ask earlier. As he approached Pitzer's office, he overheard Pitzer say to Byrd's secretary, "That black son-of-a-bitch, he doesn't know who he's messing with. I'll nail his black ass up against the wall. I'll have him followed and fired." Byrd went into Pitzer's office doorway and said, "John, my mother is not a dog." Byrd then reported this incident to Doris Turner, the Department's EEO officer. Turner promised to call Pitzer's boss to report the incident. Although Turner did not follow-up with Byrd, Pitzer delivered an insincere apology a few days later.

Byrd receives a performance review on an annual basis. The review evaluates Byrd in eight categories of performance and also includes an overall rating. The four possible ratings in each category are "unacceptable," "acceptable," "accomplished," and "exceptional." Up to and including his 1999 annual review (which covered the period from October 1, 1997 through September 30, 1998 and was completed on March 15, 1999), Byrd had never received an "unacceptable" rating in any category in any of his thirteen annual performance reviews. In that 1999 review, Byrd received an overall rating of "acceptable." Byrd felt he deserved a higher rating and that the Department was not recognizing all of his accomplishments, many of which his counterparts in the other three regions had not achieved. Salary increases were based on the performance evaluations. When Byrd learned that his Caucasian counterpart in Chicago had received a higher raise than he had, he filed a charge of race discrimi-

nation against the Department on March 30, 1999. In fact, as he later learned, Byrd's salary was significantly lower than all three of the Caucasian epidemiologists in the other three regions for each year between 1995 and 2003, even though Byrd was the only epidemiologist with a master's degree in public health.[2]

In the summer of 1999, several months after Byrd filed the charge of discrimination, the Illinois Human Rights Department ("IHRD") held a fact-finding conference on the charge. In attendance were Kelly, Langkop, Turner, Byrd and his wife, as well as a representative from the IHRD. Thus, as of the summer of 1999, Kelly and Langkop were aware that Byrd had filed a charge of race discrimination. According to Byrd, this is when the Department began to retaliate against him for filing the charge.

In 1996, Byrd had founded the Bi-State Infectious Disease Conference ("Bi-State Conference"), an annual educational conference for public health officials in Illinois and Missouri. The Bi-State Conference allowed public health officials in these bordering states to share information with each other about disease outbreaks. Byrd served as chairperson of the conference for several years and also served in other capacities. Although the Department did not sponsor the Bi-State Conference, many Department employees attended the Conference each year and some Department employees spoke at the Conference. Prior to Byrd filing a

---

[2] Langkop claimed to have noticed this discrepancy only after Byrd filed his discrimination charge, and the Department attempted to explain the difference by pointing to the fact that Byrd had been with the Department since the beginning of his career but the other epidemiologists had come from the private sector where, presumably, salaries are higher. In any event, the Department made some adjustments to Byrd's salary in 2002 and 2003 after "noticing" that Byrd's salary lagged behind that of co-workers with similar responsibilities in other parts of the state.

discrimination charge in 1999, the Department placed no
restrictions on Byrd's support of the Conference. With the
approval of Pitzer and Byrd's supervisor, Byrd used many
resources from the Edwardsville Regional Office to support
the Conference including conference rooms, secretaries,
administrative support, and copy and postage machines. At
the fact-finding conference held by the IHRD in the summer
of 1999, Byrd complained that he had not been recognized
in his annual review for his extensive work with the Bi-
State Conference. In response, Kelly demanded that he
scale back on his participation in the Conference.

Before Byrd's next annual review for fiscal year 2000,[3]
Kelly solicited input into Byrd's review from Pitzer. Kelly
sent Pitzer a draft of the review and Pitzer suggested a
number of changes. For this review, the first one following
Byrd's charge of discrimination, Kelly and Langkop called
Byrd to Springfield to discuss the evaluation. Byrd had
never before been called to Springfield for his annual
evaluation and had never had a formal meeting to discuss
his evaluation. At this meeting, Kelly and Langkop told
Byrd that two local health departments had complained
about his behavior that year. They also mentioned that he
had failed to inform the information officer that he had
appeared on television, giving a brief interview about a
hepatitis outbreak. They told him that he was not updating
and submitting his work schedules on a timely basis, and
they mentioned an incident involving Byrd wearing shorts
to the office and arguing with Pitzer about this. According
to Byrd, Kelly and Langkop did not convey even one
positive comment about his work performance that year.
Byrd told Kelly and Langkop that he was upset by this
review. Langkop and Kelly had a different take on the
meeting, taking formal disciplinary action against Byrd for

---

[3] The fiscal year 2000 annual review covered Byrd's work from
October 1, 1998 through September 30, 1999.

how he behaved at this performance review. A written memo documenting the disciplinary counseling session stated that Byrd had engaged in unacceptable behavior at this annual review, and that he had been "loud, abrasive, and sometimes intimidating" during his review. Byrd denied that he had engaged in any of these behaviors during the performance review.

In 2000, the Department placed new restrictions on Byrd's participation in the Bi-State Conference. He was not allowed to serve as chairperson for the Conference, and was instructed not to use the Department's postage meter to send out Conference materials, and not to receive or process checks for the Conference in the Edwardsville Regional Office, both of which he had been permitted to do in the past. Byrd was also required to seek advance approval from Pitzer for any clerical assistance for the Conference. When Byrd's supervisors learned that the planning committee for the Bi-State Conference had decided to establish the "Lester Byrd Award" to honor a person in Illinois and Missouri who demonstrated professionalism and dedication to public health in the area of infectious disease, they instructed Byrd to tell the Conference organizers to either withdraw the award or name it after someone else. They asked that the award be named after someone who was dead or retired and suggested it be named after Dr. White, a Caucasian man who had served as the head of the Department's Division of Infectious Diseases but who had never been involved with the Bi-State Conference. Kelly, Langkop and Sherry Bornstein (who was Langkop's boss) told Byrd that the Department wanted to become a co-sponsor of the Conference but only if certain conditions could be met, including the renaming of the Lester Byrd Award. They asked Byrd to convey these requirements to the co-chairs of the Conference, who declined the Department's invitation. After this happened, Kelly sent a letter to Byrd telling him that no employee would be able to work for the Bi-

State Conference unless the work was done as a private citizen:

> Mr. John Pitzer states the same will also be true for members of the Edwardsville Regional Office support staff. Also, no State supplies or equipment can be used to support any conference activity. If you desire to continue to function as a chairperson for the facilities committee, you will need to use vacation or personal time to attend the meetings. Mileage charges to attend these meetings will not be reimbursed by the Department.

Pl. Ex. 409. Because the Department had previously included Byrd's work on the Bi-State Conference as a performance objective in his evaluation, Kelly also told Byrd that this performance objective would be removed with no penalty. Kelly solicited Pitzer's input on these topics before sending Byrd memos on the Department's position on the Bi-State Conference. Pitzer did not believe it was appropriate to give an award to or name an award after Byrd. Ultimately, the Bi-State Conference organizers decided to continue to refer orally to the award as the Lester Byrd Award but to give the awardee a plaque labeled "The Public Health Award" because the Conference organizers feared getting Byrd into trouble with the Department if they publicly persisted in naming the award after him.

The Department took other disciplinary measures against Byrd following the filing of his discrimination complaint. In particular, in April 2000, Kelly gave Byrd an oral reprimand for not submitting updated work schedules, a charge Byrd disputed. Steelman testified that some Caucasian employees, including Pitzer, did not submit weekly work schedules as required or would simply forget to submit their schedules. Steelman testified that the only employee ever disciplined for failing to submit a weekly schedule was Byrd. Also in 2000, Byrd received his first ever rating of

"unacceptable" in one of the eight performance categories on his annual review. Although he received an overall rating of "accomplished," this was the first time in fifteen years of working at the Department that he had been found to be "unacceptable" in some aspect of his work. He again believed that his reviewers were ignoring some of his important accomplishments that year, including coordinating with Missouri health officials on a large outbreak of hepatitis A in the bi-state area.

The situation did not improve for Byrd in 2001. The Department initiated disciplinary action against him three times in eight months. The year began with a written warning to Byrd in January for displaying "conduct unbecoming a public health employee." This related to an argument with Pitzer. The parties told vastly differing stories about what happened, but both agreed that when Byrd came into the office one January day, his secretary told him that Pitzer was looking for him. Byrd went to speak to Pitzer and a confrontation ensued. After Pitzer complained to Kelly, Kelly and Langkop hand-delivered the written warning to Byrd at the Edwardsville Regional Office without ever asking Byrd for his version of events.

In July 2001, the Department issued a written warning to Byrd for excessive tardiness. This warning was again based on a complaint initiated by Pitzer. Pitzer reported to Kelly that Byrd was often late arriving to the office. Kelly then asked Pitzer to begin documenting what time Byrd arrived at work each day. Pitzer enlisted the aid of the secretarial support staff in tracking Byrd's arrival time. Pitzer allegedly collected information from the secretaries, added his own observations and passed the allegations onto Kelly. Byrd disputed many of the claims Pitzer made and noted that he worked late or skipped lunch on days that he arrived late. Steelman testified that many Caucasian employees were sometimes tardy, including Pitzer, and that none had ever been disciplined.

In August 2001, Byrd received his third disciplinary action of the year when Kelly suspended him for three days without pay over a parking dispute with Pitzer. Again, Byrd told a very different story than Pitzer. Both agree that Byrd had parked his truck and trailer in the grass behind the building on the day in question. When Pitzer saw that the truck was parked in the grass, he asked another employee to accompany him to Byrd's office as a "witness" when he asked Byrd to move the truck. Both Byrd and Pitzer reported that Byrd responded to this request with laughter, but that he moved the truck to the parking lot. Pitzer and another office staffer thought the truck was then blocking parking lot traffic and asked Byrd to move the truck again. After a verbal exchange, Byrd moved the truck a second time. According to the "Statement of Charges" issued against Byrd, Byrd laughed at the first request and shut his office door in Pitzer's face. The Statement charged that when Pitzer made the second request to move the truck, Byrd first delayed opening his door to respond to the request and then shouted at Pitzer before moving the truck a second time. The Statement concluded:

> These actions clearly demonstrated failure to follow simple verbal instructions, as well as a lack of professionalism, courtesy and consideration of others in the work environment, in addition to interrupting operations of the office.

Pl. Ex. 20. According to Byrd, he did not shout at Pitzer. Byrd testified that after he moved the truck a second time, he asked Pitzer if the new space was acceptable. Pitzer replied that it was not and Byrd moved the truck a third time, this time to a spot specified by Pitzer as acceptable. Byrd testified that a Caucasian employee, Bob Winning, sometimes parked his truck and trailer in the same spot in the grass where Byrd had parked that day without incident. Winning, a Department employee and friend of Pitzer, testified that he in fact parked his truck and trailer in

the grass a few times in 2001 and was never asked to move it.

Byrd's problems with the Department in 2001 culminated in "unacceptable" ratings in two of the eight categories of his 2001 annual review. His overall rating for 2001 was "acceptable." This was Byrd's last review until he received his 2002 review a few weeks before the trial of this case in April 2003. Byrd received an overall rating of "acceptable" in his 2002 review, which was held so late that six months of the new fiscal year had passed before Byrd was told at his review what his work objectives would be for that fiscal year.

## II.

Byrd sued the Department for race discrimination and retaliation under Title VII. A jury trial resulted in a verdict in favor of the defendants on the discrimination claim and in favor of Byrd on the retaliation claim. The jury assessed damages of $15,090 for lost wages from April 5, 1997 through April 24, 2003, plus $82,500 for emotional pain, humiliation, and loss of enjoyment of life, for a total award of $97,590. The Department appeals the jury verdict in favor of Byrd on the retaliation claim. Because Byrd did not cross-appeal the verdict on the discrimination claim in favor of the defendants, only the retaliation claim is before us on appeal.

The Department argues that one of the jury instructions misstated the legal effect of information supplied by a person (in this case, Pitzer) who was not a decisionmaker as to the terms and conditions of Byrd's employment. Specifically, the Department contends that the instruction wrongly allowed the jury to hold the Department liable for Pitzer's discriminatory animus without proof that Pitzer concealed relevant information from or provided false information to those who were decisionmakers for a dis-

criminatory or retaliatory purpose. The Department also objects to the court's failure to instruct the jury that the employer should not be held liable for a non-decisionmaker's conduct if the employer conducted an independent examination of the issue or relied on other, non-discriminatory sources of information in deciding to discipline the employee. The Department complains that the instruction given did not require Byrd to prove that the Department knew or should have known about Pitzer's illegal bias before holding the Department liable for that bias. The Department also maintains that the evidence was insufficient to sustain the jury's verdict that the Department retaliated against Byrd for filing charges with the EEOC. The Department thus asks this court to not only vacate the judgment but to remand with directions to enter judgment in favor of the Department. Byrd, of course, maintains that the instruction accurately stated the law and points out that the disputed instruction was a nearly direct quote from one of our cases. To the extent the instruction did not account for all relevant aspects of the law, Byrd contends that the Department was not prejudiced by the instructions as a whole. Finally, if we deem the instruction erroneous and prejudicial, Byrd argues that the case should be remanded for a new trial rather than for entry of judgment in favor of the defendants.

**A.**

We turn first to the jury instruction at issue. We "consider a trial court's jury instructions with deference, analyzing them as a whole to determine if they accurately stated the law and did not confuse the jury." *Schobert v. Illinois Dep't of Transp.*, 304 F.3d 725, 729 (7th Cir. 2002). *See also Boyd v. Illinois State Police*, 384 F.3d 888, 894 (7th Cir. 2004) (we review jury instructions only to determine if taken as a whole they correctly informed the jury of the applicable law, reversing only if a litigant is prejudiced); *Aliotta v. National R.R. Passenger Corp.*, 315 F.3d 756, 759 (7th Cir. 2002) (we review jury instructions with deference, analyzing them as a whole to determine if they accurately state the law and do not confuse the jury); *Lenker v. Methodist Hospital*, 210 F.3d 792, 796 (7th Cir. 2000) (same). We do not require that the trial court issue an "idealized set of perfect jury instructions," but the instructions must be correct legal statements and must be supported by the evidence. *Schobert*, 304 F.3d at 730 (quoting *Knox v. State of Indiana*, 93 F.3d 1327, 1333 (7th Cir. 1996)). We must first determine whether the instructions in question misstate the law or fail to convey the relevant legal principles in full. *Aliotta*, 315 F.3d at 759. If they do, we must then determine whether the inadequate statements confused or misled the jury causing prejudice to the appellant. *Aliotta*, 315 F.3d at 759. If an instruction is so misleading that an appellant is prejudiced, reversal is required. *Schobert*, 304 F.3d at 730.

The instruction to which the Department objected reads, in its entirety:

> If the decision makers in this case regarding Lester Byrd's salary and/or three day suspension acted as the conduit for another employee's prejudice, the innocence of the decision makers cannot relieve the Illinois Department of Public Health from legal responsibility.

Plaintiff's Proposed Instruction No. 8 ("Instruction 8"). In support of this instruction, Byrd cited *Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990). The Department objected to this instruction on the ground that it did not adequately state the law. In particular, the Department complained that the phrase "conduit for another employee's prejudice" was not defined anywhere and was vague. The Department countered that its own Proposed Instruction No. 22 adequately and accurately stated the law regarding when a comment made by a non-decisionmaker could be imputed to the decisionmaker and asked that this instruction be given instead of Byrd's proposed instruction:

> Evidence of discriminatory or retaliatory motive harbored by someone other than the person, or persons, with ultimate authority to take the adverse employment action at issue in this case is generally not relevant to the question of whether the employer discriminated or retaliated against the plaintiff. Before the discriminatory or retaliatory acts of a non-decisionmaking employee may be imputed to the employer you must find 1) that the non-decisionmaking employee caused the adverse employment action by supplying the employer with false information or concealing information from the employer; 2) the non-decisionmaker would not have supplied the false information or concealed information, but for the discriminatory or retaliatory animus; and 3) the employer knew, or should have known, of the non-decisionmaker's discriminatory or retaliatory motive.
>
> If, however, the employer conducts its own investigation or acts based on other information from unbiased sources, the causal connection is broken and the bias of the non-decisionmaker cannot be imputed to the employer.

Defendants' Proposed Instruction No. 22 ("Instruction 22"). In support of this instruction at trial, the Department cited

*Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446 (7th Cir. 1994); *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997); *Alexander v. Wisconsin Dep't of Health & Family Servs.*, 263 F.3d 673, 685 (7th Cir. 20010); and *Mateu-Anderegg v. School Dist. of Whitefish Bay*, 304 F.3d 618, 626-28 (7th Cir. 2002) (Ripple, J., concurring).

As we noted, the court rejected Instruction 22 and instead gave Instruction 8. Because we must consider the challenged instruction in the context of other relevant instructions given, we note briefly two other related instructions (in relevant part) that the court gave:

> It is Lester Byrd's burden to prove that it is more probably true than not true that because he filed a charge of discrimination with the Equal Employment Opportunity Commission, he suffered retaliation by the Illinois Department of Public Health regardless of whether his complaint turned out to be true.
>
> . . . . . . . . . . . . . .
>
> The law allows an employer substantial latitude for the exercise of its business judgment in employment actions. An employer has the right to make business decisions even if its decisions are mistaken or poorly founded as long as it does not make its decisions on a prohibited basis. A jury must not second guess an employer's decision. Your task is to determine whether the defendant discriminated and retaliated against the plaintiff. If the defendant's decisions were the result of business considerations, then defendant did not violate the law, even if you disagree with the employer's conclusions or decisions.

In combination with the challenged instruction, these were the main substantive instructions given to the jury on the issue of retaliation.

We can quickly resolve a threshold issue that arose at oral argument. The court inquired whether Instruction 8

applied to both the discrimination and the retaliation claims or whether it applied to the discrimination claim alone. At oral argument, Byrd's counsel conceded that the instruction applied to both claims and that the court would therefore need to address it. The Department took a similar position. After oral argument, the parties filed supplemental statements on the issue, with Byrd changing his position. Byrd argued that the jury could have concluded that the instruction applied only to the discrimination claim, and that because there was evidence that Kelly and Langkop harbored their own retaliatory motive, the jury had a basis other than imputed liability for holding the Department liable for retaliation. The Department reiterated its earlier position that the instruction was not facially limited to the discrimination claim. Moreover, the Department objected that this recharacterization came too late and that Byrd argued to the jury that the Department could be held liable under an imputed liability theory for both the discrimination and retaliation claims. Reading the instructions as a whole, we are inclined to agree with the Department. Nothing in Instruction 8 limits its application to the discrimination claim, and Byrd argued that the Department could be held liable for both discrimination and retaliation based on Pitzer's motives. Because the jury could have applied Instruction 8 to the retaliation claim, we must address the Department's objection to the instruction.

Byrd relied on our opinion in *Shager* in support of this instruction. *Shager*, 913 F.2d at 404-07. Shager sued his employer for age discrimination after he was terminated from a sales job. His immediate supervisor, Lehnst, who did not have the ultimate authority to fire him, harbored age-related biases and made comments indicating a hostility to older workers. Lehnst gave Shager an unfavorable sales territory where Shager then performed better than expected. Lehnst gave the prime sales territory to a younger worker who proceeded to fail to meet sales expectations in

that area. Nonetheless, Lehnst made excuses for the younger worker while being unduly harsh in his criticism of Shager for alleged deficiencies in collecting accounts receivable and managing his salesmen. Lehnst recommended to the company's "Career Path Committee" that Shager be fired and the Committee obliged. The issue was whether Lehnst's hostility to older workers could be imputed to the company. 913 F.2d at 400-04.

There was no evidence that any member of the Career Path Committee harbored any hostility to older workers or preference for younger ones. We looked to common law tort principles to determine when an employer could be held liable for the supervisor's conduct. We noted that when a supervisor was acting within the scope of his employment in taking an action against the employee, for example by firing an employee albeit with a wrongful motive, his behavior was not so far beyond the orbit of his responsibilities as to excuse the employer. 913 F.2d at 405. Lehnst had not fired Shager directly but rather recommended his termination to the Career Path Committee which in turn terminated Shager:

> If it did so for reasons untainted by any prejudice of Lehnst's against older workers, the causal link between that prejudice and Shager's discharge is severed, and Shager cannot maintain this suit even if [the company] is fully liable for Lehnst's wrongdoing.

*Shager*, 913 F.2d at 405 (citations omitted). We noted that if Shager's evidence was believed, the Committee's decision to fire him may well have been tainted by Lehnst's prejudice; indeed, Lehnst's influence may have been decisive:

> Lehnst was the district manager; he presented plausible evidence that one of his sales representatives should be discharged; the committee was not conversant with the possible age animus that may have motivated Lehnst's recommendation. **If it acted as the conduit**

**of Lehnst's prejudice—his cat's paw—the inno-
cence of its members would not spare the com-
pany from liability.** For it would then be a case where
Lehnst, acting within (even if at the same time abusing)
his authority as district manager to evaluate and make
recommendations concerning his subordinates, had
procured Shager's discharge because of his age. Lehnst
would have violated the statute, and his violation would
be imputed to [the company]. The committee would be
out of the picture.

*Shager*, 913 F.2d at 405 (emphasis added).

We have highlighted the portion of the *Shager* case that
served as the source for Instruction 8. A simple comparison
with the challenged instruction demonstrates that, as Byrd
argued, Instruction 8 is a close paraphrase of the language
in *Shager*. Although "conduit" is not a defined word in
*Shager* or in Instruction 8, we think the meaning is plain
enough: if the employer simply rubber-stamps a recommen-
dation tainted with illegal bias, the employer is liable for
the harm caused. The instruction is thus not an incorrect
statement of the law; but it is an incomplete statement of
the principle at work in *Shager*. The court failed to instruct
the jury that the causal link could be broken if Kelly and
Langkop took action against Byrd for independent reasons
untainted by any illegal motive of Pitzer. *Shager*, 913 F.3d
at 405. *See also Willis*, 118 F.3d at 547 ("[W]hen the causal
relationship between the subordinate's illicit motive and the
employer's ultimate decision is broken, and the ultimate
decision is clearly made on an independent and a legally
permissive basis, the bias of the subordinate is not rele-
vant."). Thus, if the Department investigated these various
incidents and honestly though perhaps incorrectly came to
the conclusion that Byrd had behaved in a manner that
warranted discipline, the Department would not be liable
for Pitzer's hidden bias.

According to the Department, this omission was prejudicial because there was evidence that Kelly engaged in an independent review before deciding to discipline Byrd and was not merely acting as a rubber stamp for Pitzer's prejudices. For example, when Byrd was disciplined for his behavior at his 2000 evaluation, Kelly and Langkop were firsthand witnesses to this event and two other employees corroborated Kelly and Langkop's view of this meeting. Pitzer had no input into this incident at all. Other employees corroborated Pitzer's complaints that Byrd was not submitting timely weekly work schedules, that he was arriving late at work, that he sometimes behaved abrasively, and that he quarreled with Pitzer over the truck parking incident. According to the Department, independent investigation and corroboration of these events relieved the Department of any liability for Pitzer's wrongful motives as a matter of law. Byrd argues that there was no prejudice because, even with the challenged instruction, the jury found against Byrd on his discrimination claim. Byrd also maintains there was no prejudice because the jury could have found the Department directly liable for retaliation without any of the evidence about Pitzer and his input into the Department's decisions.

We agree that the Department was prejudiced by this omission and that the jury should have been informed that the causal link could be broken if the ultimate decision was clearly made on an independent and a legally permissible basis untainted by Pitzer's bias. *See Dawson v. New York Life Ins. Co.*, 135 F.3d 1158, 1165 (7th Cir. 1998) (an incorrect instruction calls for a new trial even if the jury could have based the verdict on a different, properly instructed theory). However, we believe the cases (and possibly the evidence) do not go as far as the Department's instruction suggests. The Department regularly solicited Pitzer's advice in Byrd's evaluations and there is ample evidence that Pitzer was biased. Pitzer's involvement in the

evaluation process raises the possibility that the Department's disciplinary decisions as to Byrd were based on multiple grounds and that one or more of these grounds were illegitimate. If so, the Department could be liable for Pitzer's biased input unless the Department can demonstrate to the jury that it would have taken the same disciplinary actions against Byrd absent any tainted input from Pitzer. *See Dey,* 28 F.3d at 1459-60 (although the employer attested he based a termination decision on an independent assessment of plaintiff's performance that was apparently unaffected by any knowledge of the plaintiff's harassment complaints, he conceded that he solicited the harasser's input, that the harasser agreed the plaintiff should be fired, and thus the harasser's input may have introduced a discriminatory animus into the employer's decision, making it reasonable to infer a causal link between the plaintiff's complaints and her eventual discharge). *See also Desert Palace, Inc. v. Costa*, 123 S.Ct. 2148, 2152-55 (2003) (once a plaintiff presents sufficient evidence for a reasonable jury to conclude by a preponderance of the evidence that an illegal ground was a motivating factor for any employment practice, the plaintiff is entitled to a jury instruction entitling the plaintiff to damages unless the defendant proves by a preponderance of the evidence that it would have taken the same action even if the illegal ground had played no role in the decision).

The Department's awkward alternative Instruction 22 tries to make this point but itself contains some errors of law and the district court was right to reject it. For the sake of clarity on remand (we will discuss in a moment why we are remanding rather than directing judgment for the Department), we will point out those errors here. First, under the "cat's paw" theory, in cases involving tangible employment actions (as was the case here with the three-day suspension and the lower salary, for example), the plaintiff is not required to prove that the employer knew or

should have known of the non-decisionmaker's discriminatory or retaliatory bias before that bias can be imputed to the employer. Rather, as we held in *Shager*, the employer may not be "conversant with the possible [discriminatory or retaliatory] animus that may have motivated [the non-decisionmaker's] recommendation" but may nonetheless be liable for that animus if it acts as a conduit for the non-decisionmaker's bias. 913 F.2d at 405. Indeed, in describing the conduit or cat's paw theory in another case, we said that when a company sets up several layers of *pro forma* review but the operative decision is that of a subordinate with an illicit motive, we impute to the company the discriminatory motive of the subordinate rather than the motive of the ignorant decisionmaker. *See Willis*, 118 F.3d at 547. We would hardly be referring to the decisionmaker as "ignorant" if we required the plaintiff to show that the decisionmaker knew or should have known about the subordinate's bias. In fact, if the decisionmaker knew of the bias, we would have no need for a cat's paw theory at all because liability would be direct.

We take a moment to distinguish a few of the cases relied upon by the Department in support of its argument that the plaintiff must prove the employer knew or should have known of the non-decisionmaker's bias before being held liable for that bias. When submitting Instruction 22, the Department cited *Alexander*, 263 F.3d at 685. On appeal, the Departmentadditionally cites *Knox v. State of Indiana*, 93 F.3d 1327, 1332, 1334-35 (7th Cir. 1996) and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998). In *Alexander*, the employer investigated a complaint made by an allegedly biased employee (Carlson) against the plaintiff (Alexander). After hearing accounts of the incident from both Alexander and Carlson, the employer decided to suspend Alexander for ten days without pay. We remarked that the employer's reliance on Carlson's version of events would not have been acceptable if Carlson harbored racial animus toward

Alexander and the employer knew or should have known of Carlson's bias. *Alexander*, 263 F.3d at 685. The only point this proves is that if an employer knowingly acts on information from a biased employee, the investigation is not really independent and will not relieve the employer of liability. *Alexander* is not a typical "cat's paw" or conduit case; the evidence demonstrated that the employer did not rubber-stamp a recommendation made by a biased employee but engaged in an independent investigation that revealed no illicit bias by Carlson.

*Knox* stands for the unremarkable proposition that an employer can be held liable under Title VII for sexual harassment by an employee's co-workers if the employer had actual or constructive knowledge of the harassment and failed to address the problem. *Knox*, 93 F.3d at 1334. In *Knox*, the plaintiff was subject to sexual harassment from a co-worker who was retaliating against her for complaining about his earlier sexual harassment of her. We affirmed a jury instruction that held the employer liable for the co-worker's harassment that occurred with the knowledge and acquiescence of the employer. The court instructed the jury that an employer acquiesces in retaliatory harassment "when the employer knows of the harassment and fails to act promptly to take actions reasonably likely to remedy the harassment and prevent future episodes." *Knox*, 93 F.3d at 1332-33. Again, this was not a cat's paw or conduit case. The employer was not accused of taking a tangible employment action against an employee based on the unexamined recommendation of a subordinate who harbored an illegal bias. Rather, the employer was charged with looking the other way when a co-worker engaged in objectionable conduct that created a hostile environment for the plaintiff.

In this sense, *Knox* foreshadowed the Supreme Court's holding in *Faragher*, also cited by the Department. In *Faragher*, the Court held that an employer is subject to vicarious liability to a victimized employee for an actionable

hostile work environment created by a supervisor with immediate (or successively higher) authority over the employee. *Faragher*, 524 U.S. at 807. Under *Faragher*, when no tangible employment action is taken, an employer may raise an affirmative defense, the elements of which are irrelevant here. But no affirmative defense is available when the supervisor's harassment culminates in a tangible employment action such as discharge, demotion or undesirable reassignment. 524 U.S. at 807-08. The holding in *Faragher* does not affect the result here. Byrd alleged that Pitzer's actions culminated in tangible employment actions. He alleged that as a result of the unexamined reports of a biased co-worker, he was suspended without pay and that the Department lowered his annual review scores and hence his salary. The Department of course disputes this claim, and counters that it did investigate Pitzer's charges and sought corroboration from other sources. That may be true, but it is for the jury to determine who is telling the truth. Byrd is at least entitled to have the jury instructed on the cat's paw or conduit theory of liability.

The Department's Instruction 22 also requires that the non-decisionmaking employee cause the adverse employment action by supplying the employer with false information or concealing information from the employer. The Department insists that if a non-decisionmaker with an illicit bias provides truthful information to the employer that leads to the adverse employment action, the employer cannot be held liable for the illegal bias. The Department is correct that supplying false information or concealing information are ways that a biased non-decisionmaker can influence the employer's actions. *See Alexander*, 263 F.3d at 684; *Willis*, 118 F.3d at 547. *See also Eiland v. Trinity Hosp.*, 150 F.3d 747, 752 n.1 (7th Cir. 1998) (summary judgment proper where the plaintiff has no evidence that non-decisionmaker had a discriminatory animus or that he tainted the decisionmaker's assessment of the plaintiff

and affected the decisionmaker's termination decision); *Gusman v. Unisys Corp.*, 986 F.3d 1146, 1147 (7th Cir. 1993) (citing *Shager*, 913 F.2d at 405) ("[a]n employer cannot escape responsibility for wilful discrimination by multiple layers of paper review, when the facts on which the reviewers rely have been filtered by a manager determined to purge the labor force of older workers."). But we pause here to clarify an issue that may arise on remand. The Department might argue, for example, that Pitzer truthfully reported that Byrd was late coming into the office on occasion, and that the Department cannot be held liable for disciplining an employee for conduct that otherwise warrants discipline. This is generally true, but the instructions must take into account that Pitzer may have selectively reported Byrd's lateness, leaving out the fact that he himself or other Caucasian employees were similarly late. Although this omission did not involve affirmative acts of concealment such as destroying records or instructing employees to withhold information, it nonetheless had the same effect as concealment. Pitzer's truthful report (if indeed it was truthful) could result in disparate, race-based treatment when Byrd was disciplined and the Caucasian employees were not disciplined for the same offense. Under the Department's Instruction 22, Pitzer's racially motivated "truthful" report on Byrd which omitted similar conduct by others would not be actionable, and so this instruction is misleading as written. Although the instruction originates in the language of some of our cases (*see, e.g.*, *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1400 (7th Cir. 1997)), we remind the parties that jury instructions "should not be patched together from snippets of appellate opinions taken out of context, but should rely first on the language of the statute." *Boyd v. Illinois State Police*, 384 F.3d 888, 894-95 (7th Cir. 2004). As we explained in *Lust v. Sealy, Inc.*, 383 F.3d 580, 584-85 (7th Cir. 2004), the cat's paw theory of liability is not nearly as narrow (or literal) as the Department portrays it to be. To paraphrase our holding there, if

the Department would not have disciplined Byrd but for Pitzer's recommendations, recommendations that a jury could reasonably find were motivated by an illegal motive, then Pitzer's bias was a cause of Byrd's injury whether or not Kelly could reasonably be thought a mere cat's paw. *Lust*, 383 F.3d at 584. In short, nearly every sentence of the Department's Instruction 22 contains a subtle (or not so subtle) misstatement of the law, and the court was correct to reject it. On retrial, the court should give Instruction 8 in combination with an instruction that removes liability for Pitzer's bias if the Department can prove that it would have taken the same disciplinary actions against Byrd absent any tainted input from Pitzer.[4]

## B.

We have focused up to this point on the Department's liability for possibly rubber-stamping the illegally motivated recommendations of one of its employees. The Department could also be held liable for retaliation if Byrd could prove that the Department itself harbored an illicit, retaliatory motive when it took certain actions against him. The Department has urged us to find that there is no need for a new trialbecause Byrd had insufficient evidence to demonstrate that Pitzer had a retaliatory motive that could be imputed to the Department, or that the Department (through the decisionmakers, Kelly and Langkop) had its own retaliatory motive. We review *de novo* the district court's decision to deny the Department's Rule 50 motion for judgment as a matter of law, and determine only whether any rational jury could have found for Byrd. *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 707

---

[4] We are certainly not saying that Instruction 8 is a model of clarity but are merely holding that the Department's objections can be addressed with an appropriate supplemental instruction as we have described.

(7th Cir. 2004); *Hall v. Gary Cmty. School Corp.*, 298 F.3d 672, 675 (7th Cir. 2002). We must review all of the evidence in the record, drawing all reasonable inferences in favor of the nonmoving party. *Tart v. Illinois Power Co.*, 366 F.3d 461, 472 (7th Cir. 2004). We may not make credibility determinations or reweigh the evidence; we must disregard all evidence favorable to the moving party that the jury is not required to believe. *Harvey*, 377 F.3d at 707; *Tart*, 366 F.3d at 472. Our review differs from that used for summary judgment only insofar as we now know exactly what evidence the jury considered in reaching the verdict. *Harvey*, 377 F.3d at 707. "Our job at this stage is not to determine whether the jury believed the right people, but only to assure that it was presented with a legally sufficient basis to support the verdict." *Harvey*, 377 F.3d at 707.

According to the Department, the evidence could not support a finding that Byrd received lower salary increases or a three-day suspension due to a retaliatory animus against him. Title VII makes it unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by" Title VII. 42 U.S.C. § 2000e-3(a). After the pretrial stage, a plaintiff need only demonstrate that he was discriminated against for opposing an "unlawful employment practice" to sustain a retaliation claim. *Schobert*, 304 F.3d at 732. *See also Harvey*, 377 F.3d at 708 (after a full trial, the only pertinent question was whether there was enough evidence to permit the jury to consider the ultimate questions of discrimination and retaliation). The Department concedes that Byrd's EEOC charge was protected expression. The Department also agrees that decisions concerning Byrd's salary and the three-day suspension would be unlawful discrimination if motivated by a retaliatory purpose. The Department claims only that Byrd had insufficient evidence to demonstrate that these decisions were motivated by a retaliatory purpose. In

particular, the Department argues that Byrd had no evidence that the Department itself harbored a retaliatory motive or that Pitzer had a retaliatory motive that could be imputed to the Department. The district court denied the Rule 50 motion because the evidence at trial demonstrated that Pitzer possessed a racial animus toward Byrd, that Pitzer regularly advised Kelly about various aspects of Byrd's work performance, and that Kelly often solicited this kind of input from Pitzer. The district court ruled that a reasonable jury could find from this evidence that Kelly acted as a conduit for Pitzer's racial animus toward Byrd and thus the evidence was sufficient to sustain the verdict.

We turn to Byrd's evidence that the Department gave him unfairly smaller salary increases and suspended him for three days in retaliation for his EEOC complaint. Byrd notes that prior to his April 1999 EEOC charge, his thirteen-year history with the Department was uneventful. He had never received an "unsatisfactory" rating on an annual review. He had received two written reprimands in 1993 for using the Department's computer and photocopier for personal use. An oral reprimand in 1998 was removed from his personnel record after he won a grievance hearing. In 1996, he had founded the Bi-State Conference and had been allowed to work in several capacities on the Conference, including as chairperson. Before 1999, the Department placed no limitations on the amount of time he could spend on the Conference and allowed him to use office resources including secretarial support, postage and photocopying on the Conference preparations. After receiving his 1999 annual review, he filed his charge of discrimination, alleging that he was given lower ratings than he deserved on account of his race. Under the Department's system, pay raises are directly tied to annual review ratings; lower reviews mean lower salary increases and so we will use reviews and salary interchangeably as we discuss Byrd's evidence. In the summer of 1999, a few

months after he filed the charge, the IDHR held a fact-finding conference at which Kelly and Langkop were present. As an example of an accomplishment that had gone unrecognized at his annual review, Byrd mentioned his contributions to the Bi-State Conference. Kelly responded that Byrd should cut back on his participation in the Bi-State Conference. This was the beginning of a series of demands the Department made to Byrd about the Bi-State Conference. Over the next year, the Department asked for greater input into the Conference and even asked the Conference not to name the new award after Byrd. When the Conference planners refused to cede to the Department's requests, the Department told Byrd he could no longer work on the Conference during work hours and that he could no longer use office resources to support the Conference.

In the meantime, as we described above, Kelly began to solicit input from Pitzer into Byrd's annual reviews. Pitzer sent Kelly approximately eighty e-mails about Byrd from June 1999 through 2001. Some of these related to annual reviews and some were complaints about Byrd that led to disciplinary actions. All in all, after Byrd filed his EEOC charge, the Department disciplined him five times, gave him unsatisfactory ratings in his annual review and suspended him over the parking lot incident with Pitzer. The Department's escalating actions against Byrd began at the fact-finding hearing for the EEOC charge, at about the same time that Byrd began having more and more difficulty with Pitzer. Pitzer took it upon himself to report Byrd's allegedly late arrivals at the office and directed other employees to watch him as well and report on him. Kelly too subjected Byrd to greater scrutiny than she had in the past, criticizing Byrd's work schedules as inaccurate and not timely submitted, for example. Byrd presented evidence that he was subjected to scrutiny and discipline for tardiness, inadequate work schedules and parking behind the

building when Caucasian employees who engaged in these same behaviors were not disciplined. Although the Department argues that Byrd had no evidence that Pitzer knew Byrd had filed an EEOC charge, the timing of these events and the dozens of communications between Pitzer and Kelly about Byrd's performance during this time allow the jury to draw an inference that Pitzer knew about the charge and was motivated by it. A reasonable jury could also conclude that, even without Pitzer's input, the Department retaliated against Byrd for filing the EEOC charge. We therefore decline the Department's invitation to direct judgment in its favor. We emphasize that our opinion is not meant as a comment on the merits; at this stage of the proceedings, we are obliged to construe the facts and all reasonable inferences drawn from them in a light most favorable to Byrd. It is for a jury to decide whom to believe and whether to draw those inferences. We are holding only that there is enough here to put the case back before a properly instructed jury. Each party shall bear its own costs of this appeal.

VACATED AND REMANDED.

A true Copy:

      Teste:

                  _____

                *Clerk of the United States Court of Appeals for the Seventh Circuit*